JOHN ULIN (SBN 165524)
Email: julin@troygould.com
AMY STALLING (SBN 316353)
Email: astalling@troygould.com
TROYGOULD PC
1801 Century Park East, 16th Floor
Los Angeles, CA 90067-2367
Telephone:    (310) 553-4441
Facsimile:    (310) 201-4746

Attorneys for Plaintiff
MAFFICK LLC

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MAFFICK LLC, a Delaware limited liability company,<br><br>          Plaintiff,<br><br>   v.<br><br>FACEBOOK, INC., a Delaware corporation, and Does 1-10, inclusive,<br><br>          Defendants. | Case No.<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S *EX PARTE* APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE *RE* PRELIMINARY INJUNCTION** |

# **TABLE OF CONTENTS**

I.     INTRODUCTION ...................................................2

II.    FACTUAL BACKGROUND..............................................4

III.   LEGAL ARGUMENT ...............................................11

    A. Legal Standard for Temporary Restraining Order ..........................11

    B. Maffick is Likely to Succeed on the Merits of Its Libel Claim .....................11

    C. Maffick is Likely to Succeed on the Merits of Its Lanham Act Claim ..........14

    D. Maffick is Likely to Succeed on the Merits of its California UCL Claim ......16

    E. Maffick is Likely to Prevail on Its Interference with Prospective Economic
       Advantage Claim..........................................................17

    F. Maffick Would Suffer Irreparable Harm in the Absence of a TRO and the
       Balance of Equities Supports Entry of an Injunction ....................18

    G. A TRO Would Serve the Public Interest ........................................21

    H. The Court Should Set an Early Trial Date and Order Expedited Discovery...21

IV.   CONCLUSION...............................................................22

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TroyGould
PC**

i

**TABLE OF AUTHORITIES**

**Cases**

*Aguilar v. Avis Ren A Car System, Inc.*, 21 Cal. 4th 121, 138-42 (1999) ....................................22

*Brown v. Electronic Arts, Inc.,*725 F.3d 1235, 1239 (9th Cir. 2013)............................................23

Cal. Civ. Code § 45 .....................................................................................................................14

*Cleary v. News Corp.*, 30 F.3d 1255, 1262-63 (9th Cir. 1994) ....................................................19

*Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 31-32 (2003).................. 17, 19

*Della Penna v. Toyota Motor Sales, U.S.A., Inc.,* 11 Cal.4th 376, 392-93 (1995)......................19

*Dep't of Parks & Rec. v. Bazaar Del Mundo, Inc.,* 448 F.3d 1118, 1123 (9th Cir.2006)...........................................................................................................................13

*Dun & Bradstreet, Inc. v. Greenmoss Builders,* 472 U.S. 749, 756 (1985)................................16

*Fish Kiss LLC v. North Star Creations, LLC*, 2018 WL 3831335 (D.N.J. Aug. 13, 2018)................................................................................................................................18

*Herb Reed Enter., LLC v. Florida Entm't Mgmt., Inc.,* 736 F.3d 1239, 1250 (9th Cir. 2013)................................................................................................................................21

*Immigrant Assistance Project v. INS*, 306 F.3d 842, 872 (9th Cir. 2002)...................................13

*Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 962-69 (2002) ...........................................................18, 21

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 570 U.S. 118, 131 (2014) ...................17

*Lippitt v. Raymond James Fin. Servs., Inc.*, 340 F.3d 1033 (9th Cir. 2003) ...............................18

*Martin v. Reynolds Metals Co.*, 224 F. Supp. 978, 984 (D. Or. 1963) .......................................22

*Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18–19 (1990).......................................................14

*New York Times v. Sullivan*, 376 U.S. 254, 279–80 (1964) ........................................................15

*Okun v. Super. Ct*, 29 Cal.3d 442, 451-52 (1981) .....................................................................14

*Presley's Estate v. Russen*, 513 F. Supp. 1339, 1376 (D.N.J. 1981).............................................17

*Proctor & Gamble Co. v. Haugen*, 222 F.3d 1262, 1271-73 (10th Cir. 2000) ...........................17

*Reflex Media, Inc. v. Endeavor Standard SDN. BHD.*, 2019 WL 6792792, at *4 (C.D. Cal. Aug. 19, 2019)....................................................................................................21

*San Antonio Cnty. Hosp. v. S. Cal. Dist. Council of Carpenters*, 125 F.3d 1230, 1238-39 (9th Cir. 1997)...........................................................................................................22

*Savage v. Pacific Gas & Electric Co.,* 21 Cal.App.4th 434, 449 (1993) ....................................19

*Semitool, Inc. v. Tokyo Electron America, Inc.* 208 F.R.D. 273, 276 (N.D. Cal. 2002)................................................................................................................23

*Smith v. Maldonado*, 72 Cal.App.4th 637, 645 (1999) .........................................13

*Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush and Co., Inc.,* 240 F.3d 832, 841 (9th Cir. 2001).......................................................................................................21

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 24 (2008)........................13

**Statutes**

15 U.S.C. § 1116(a)................................................................................................22

15 U.S.C. § 1125(a)(1)(A)......................................................................................16

Cal. Bus. & Prof. Code § 17200 ............................................................................18

Cal. Bus. & Prof. Code § 17203 ............................................................................23

*Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339-40 (1974) ........................ 14, 15, 21

*See* Fed. R. Civ. P. 26(d)(1)...................................................................................23

**Treatises**

1 J. Thomas McCarthy, *Trademarks & Unfair Competition* § 1:16 (5th ed. 2020) .....................19

**TroyGould PC**

- 0.0

## I. INTRODUCTION

On June 5, 2020, Defendant Facebook, Inc. ("Facebook") published a notice on three social media pages operated by Maffick LLC ("Maffick"), stating publicly that Maffick's pages are "Russia state-controlled media" ("the Notice").  *See* Declaration of Anissa Naouai at ¶ 20 ("Naouai Decl.").  That statement is false.  Maffick is a Delaware LLC, owned and controlled, both editorially and operationally, by United States citizens who live and work in Los Angeles.  *Id.* at ¶ 2-3.

Facebook has stated publicly that, when it designates a social media page as "state-controlled media," that means that the page or its proprietors "are wholly or partially under the editorial control of their government."  *See* Request for Judicial Notice ("RJN") at Exhibit 1. Facebook has explained that it labels state-controlled media entities in order "to provide an extra layer of protection against various types of foreign influence in the public debate ahead of the November 2020 election in the US."  *Id.*  The pages that Facebook has labeled as state-controlled media include Russia's RT, China's Xinhua, and ones operated from North Korea and Iran – and Maffick.  *Id.* at Exhibit 2.

The false "Russia state-controlled media" label has had a devastating effect on Maffick's reputation and its business opportunities and relationships.  *See* Naouai Decl. at ¶ 25.  In the period since Facebook published the Notice, Maffick's monetization of its pages (from sources such as advertising, subscription, and e-commerce) has dropped by 50% from its monthly average for 2020.  *Id.*  In May and June 2020, Tubular Labs ranked Maffick's "In the Now" in the top ten of all U.S. Facebook pages for news and politics, based on total number of views.  *Id.*  Maffick expects that number will have fallen sharply for July 2020.  *Id.*  Early reports of the "reach" of Maffick's social media pages during July show a drop of 74%.  *Id.*

The drop in viewership and monetization reflects strong negative reactions among Facebook users to the Notice.  Since Facebook first designated Maffick as "Russia state-controlled

TroyGould
PC

- 0.0

media," numerous comments on Maffick's pages reveal the harmful effect the designation has had on Maffick's reputation as a social media source.  *Id.* at ¶ 24.

Over the past several weeks, Maffick has attempted to work with Facebook to resolve this dispute and eliminate the false "Russia state-controlled media" designation from its pages.  *See* Naouai Decl. at ¶¶ 17-21; *See* Declaration of John Ulin ("Ulin Decl.") at ¶¶ 2-4, 6.  Maffick wrote to Facebook on no fewer than nine occasions, often receiving no response.  *Id.*  When Facebook has responded, it has not provided any factual basis for its false assertion that Maffick is under the editorial control of the Russian government.  *See* Ulin Decl. at ¶ 5, 7.  Nor has it apparently taken additional steps to investigate materials that Maffick provided, which demonstrate that it is a U.S.-based limited liability company that is owned and controlled, both operationally and editorially, by United States citizens.

Instead, Facebook has repeatedly directed Maffick to its appeal procedure, which is a "black box" process in which social media companies submit information to Facebook without any identified point of contact or decision maker, communication about what additional information Facebook may need, formal opportunity to submit supplemental materials, or timetable for decision.  *Id.* at ¶ 7.  Notwithstanding these limitations, Maffick submitted an appeal to Facebook on June 30 and has heard nothing in response, outside of correspondence with Facebook's outside counsel that Maffick's counsel initiated in an effort to avoid this lawsuit.  *See* Naouai Decl. at ¶ 21; Ulin Decl. at ¶ 5, 7.

When Maffick requested that Facebook remove the false "Russia state-controlled media" designation from its pages, identify a point of contact for the appeal, and establish a timetable for decision, Facebook responded, on July 24, 2020, denying all three requests.  *See* Ulin Decl. at ¶ 7. Maffick is continuing to pursue the appeal process, but given the immediate and irreparable harm that Facebook's false statements are causing and threaten to cause to Maffick's reputation and its business relationships and opportunities, Maffick was left with no choice, but to file this litigation and pursue interim relief from a neutral arbiter who will decide matters on an established timetable.

**TroyGould PC**

- 0.0

Maffick therefore comes before this Court seeking a TRO that will restrain Facebook from continuing to post the false Notice on Maffick's pages that designates them as "Russia state-controlled media," pending a hearing on a preliminary injunction. Facebook's false statements about the origins, sponsorship, and editorial control of Maffick's pages, and their affiliation, connection or association with the Russian government, threaten immediate and irreparable harm that mandate interim relief while this dispute is being litigated. While a TRO is the appropriate remedy, to the extent this Court has concerns about entering an interim injunction, Maffick respectfully requests that it set this matter for expedited trial and authorize discovery to commence immediately, including into Facebook's purported basis for its false statement that Maffick and its pages are under the editorial control of the Russian government.

## II. FACTUAL BACKGROUND

Maffick LLC is a social media company that focuses on social media optimization and brand development. It operates three social media channels on Facebook and Instagram. Maffick also offers e-commerce merchandise for sale over its social media pages. *See* Naouai Decl. at ¶¶ 4-5.

Maffick's channel "In the Now" is directed toward a community of mindful media consumers and is centered around important, curious and purpose-driven content. It tells stories about social justice, everyday heroism, acts of kindness and doing good where it matters most. Examples of recent stories include a delivery man who received a surprise gift from a customer, a man whose family was killed in a plane crash, and lessons we can learn from indigenous people about connectedness. *Id.* at ¶ 6.

Maffick's channel "Waste-Ed" focuses on environmental issues and sustainability, both in the content it delivers, and the companies and brands promoted on the channel. Examples of recent stories include an eleven-year-old who recycled nearly one million cans, a trash picking action figure, and the relocation of a one-hundred-year-old tree. Maffick also operates an e-commerce site through Waste Ed, promoting environmentally conscious products. *Id.* at ¶ 7.

TroyGould
PC

- 0.0

Maffick's channel "Soapbox" delivers political opinion and seeks to expose hypocrisy across the political spectrum.  Examples of recent stories include an Iraq War veteran relating his experiences, a video of Nelson Mandela responding to a reporter who was critical of him, and a post indicating that prison sentences are 20% longer for black men than for white men for similar crimes.  *Id.* at ¶ 8.

Maffick's channels are intentionally non-partisan and Maffick does not seek to represent any one point of view.  Its mission statement makes clear that there are more than two sides to every story and it actively seeks to produce content that rises above any one perspective to tell stories in a neutral manner that encourages its audience to form their own opinions.  *Id.* at ¶ 9.  Maffick determines what content to post based on analytical data from CrowdTangle and Tubular Labs concerning audience preferences.  *Id.*

On May 18, 2020, Facebook contacted Maffick and threatened to shut down all of its social media pages by May 22, 2020, unless Maffick posted a disclosure on all of its accounts stating that Maffick was "a brand of Maffick Media, which is owned and operated by Ruptly GmbH, a subsidiary of RT news." *Id.* at ¶ 14.

Maffick is not owned or operated by Ruptly GmbH ("Ruptly") and is not a brand of Maffick Media GmbH.  *Id.* at ¶ 15.  Ruptly is a part-owner of an inactive German entity, Maffick Media GmbH, in which Anissa Naouai owned a 49% interest.  *Id.*  Maffick Media no longer does business of any kind.  *Id.*  In July 2019, Ms. Naouai formed Maffick LLC, a Delaware entity, with which Ruptly has no involvement.  *Id.* at ¶ 16.  Ms. Naouai, who is a United States citizen, is Maffick LLC's sole member.  *Id.* at 2.  She operates Maffick's social media pages and, working with her staff at Maffick LLC, exercises editorial control over the content posted there.  *Id.* at ¶ 16.

On May 19, 2020, Maffick responded to Facebook, indicating that its social media pages were actually owned by Maffick LLC, an independent company owned and operated by a United States citizen, and that complying with Facebook's demand that it disclose publicly that it was "owned and operated by Ruptly GmbH, a subsidiary of RT news" would require Maffick to post inaccurate information.  *Id.* at ¶ 17.  Facebook did not respond.  *Id.*  Maffick reached out to

**TroyGould
PC**

- 0.0

Facebook again on May 20, 21 and 22 seeking to resolve the situation without being required to post misinformation, but Facebook did not respond to any of those communications either. *Id.* at ¶ 18.

On May 22, 2020, motivated by concern that Facebook would shut down its pages completely, Maffick posted the phrase "Affiliated with RT" in the "About" section of its Soapbox Facebook and Instagram accounts, because that is the only Maffick social media page that posts political content. *Id.* at ¶ 19. Maffick's intention was to compromise, keep its Facebook pages operating, and to engage in further dialogue with Facebook, so that it would not be required to post inaccurate information on any of its pages. *Id.* Maffick reached out again to Facebook and again received no response. *Id.*

On June 4, 2020, Facebook publicly announced its plan "to label media outlets that are wholly or partially under the editorial control of their government," and indicated that, "today we're starting to apply labels to those state-controlled media outlets." *See* RJN at Exhibit 1. Facebook explained that it would label state-controlled media entities in order "to provide an extra layer of protection against various types of foreign influence in the public debate ahead of the November 2020 election in the US." *Id.*

According to Facebook, the "definition of state-controlled media extends beyond just assessing financial control or ownership and includes an assessment of editorial control exerted by a government." *Id.* In determining whether social media pages are under "editorial control by a foreign government," Facebook indicated it considers the following criteria:

- Mission statement, mandate, and/or public reporting on how the organization defines and accomplishes its journalistic mission

- Ownership structure such as information on owners, stakeholders, board members, management, government appointees in leadership positions, and disclosure of direct or indirect ownership by entities or individuals holding elected office

- Editorial guidelines such as transparency around sources of content and independence and diversity of sources

TroyGould
PC

- 0.0

- Information about newsroom leadership and staff
- Sources of funding and revenue
- Governance and accountability mechanisms such as correctional policies, procedure for complaints, external assessments and oversight boards

*Id.*

On June 5, 2020, without reaching out to Maffick beforehand, Facebook published a notice on the "Page Transparency" section of In the Now, Waste Ed, and Soapbox, indicating that each page is "Russia state-controlled media" ("the Notice"). *Id.* at ¶ 20. That Notice now appears on every post by In the Now, Waste-Ed, and Soapbox. *Id.* at ¶ 23. It also appears on sponsored and e-commerce posts concerning the sale of merchandise over Maffick's social media pages, falsely suggesting that the merchandise offered is somehow associated with the Russian state. *Id.*

The Notice is false. Maffick is not controlled operationally or editorially by the Russian government or by Russian state entities or officials. *Id.* at ¶ 22.

The Notice immediately resulted in negative comments from visitors to Maffick's social media pages. *Id.* at ¶ 23. Maffick is understandably concerned about having a false statement that it is "Russia state-controlled media" published on its Facebook pages and on every post is published by In the Now, Waste-Ed or Soapbox. It is also concerned about the harm to its reputation and business relationships and opportunities that the Notice is causing. As a result of these concerns, Maffick wrote to Facebook on June 30, 2020. Maffick informed Facebook that it was owned and operated by Maffick LLC and Anissa Naouai and not by any Russian governmental entity or official. It further detailed why none of Facebook's own criteria support the conclusion that Maffick is "Russia state-controlled media." *See* Ulin Decl. at ¶ 2.

With respect to "mission statement, mandate, and/or public reporting on how the organization defines and accomplishes its journalistic mission," Maffick informed Facebook that its mission statement is laid out in the Maffick Optimization Policy ("MOP"), a commercially sensitive and confidential document that Maffick offered to share with Facebook, subject to appropriate protections against disclosure to third parties. Maffick noted that it is a social media

TroyGould
PC

- 0.0

company, not a news outlet.  Its focus is social media optimization and brand development.  Maffick is intentionally non-partisan and does not seek to represent any one point of view."  *Id.* at Exhibit 1.

With respect to "ownership structure such as information on owners, stakeholders, board members, management, government appointees in leadership positions, and disclosure of direct or indirect ownership by entities or individuals holding elected office," Maffick reiterated that it is wholly owned by Maffick LLC and that Anissa Naouai is its sole shareholder.  No Russian governmental entities or officials own any direct or indirect ownership interest in Maffick or any position in management or corporate governance.  Maffick offered to provide documentation.  *Id.*

As for "editorial guidelines such as transparency around sources of content and independence and diversity of sources," Maffick noted that, while it is not a news organization, it adheres to journalistic standards in publishing, with a particular emphasis on transparency around independence and diversity of sources.  Maffick fact checks to protect against disseminating misinformation and verifies original videos not only for copyright and licensing purposes, but for accountability.  In the case of conflicting reports, Maffick bases the choice to run a story on the availability of three independent collaborations.  Maffick cites both information and media sources on screen and/or in its social copy, cites all statistics and hard facts on which opinion pieces are based, and clearly identifies archival footage to avoid audience confusion as to when an event took place.  Maffick informed Facebook that all its editorial decisions are rooted in MOP, an internal company document, which contains its editorial policy and outlines its brand mission and best practices for the optimization of visual media.  *Id.*

With regard to "information about newsroom leadership and staff," Maffick informed Facebook that it has a global production team based in Los Angeles, Berlin and Moscow and final authority on editorial matters rests with Maffick's leadership in Los Angeles, specifically Anissa Naouai and Amanda Getty.  No Russian state entities or officials have any input into editorial decisions at Maffick or any of their social media channels.  *Id.*

TroyGould
PC

- 0.0

Maffick informed Facebook that its "sources of funding and revenue" are monetization of media content, advertising for branded content that is promoted on its social media channels, and the re-sale of original content that is created for its channels. *Id.*

Finally, with respect to "governance and accountability mechanisms such as correctional policies, procedure for complaints, external assessments and oversight board," Maffick noted that it has an express policy on corrections which provides: "We acknowledge our mistakes when we make them and we're eager to learn from them. If we get it wrong, we take it down. Period. And we have systems in place to ensure that the chances of us getting it wrong are slim. In the event of a harmless mistake that can't be changed immediately (like a typo in a video), we leave the post active until engagement dies down, and then we expire it. If needed we add updates to comments/descriptions to ensure we're providing the best information we have. We have not had an instance in which we're required to publish a statement, but in the event that we do, we will make it clear publicly we understand where we went wrong." *Id.*

While there have not been external assessments of Maffick's editorial processes or accountability procedures, Maffick noted that, in 2019, it won several awards for its excellence in digital media including "Media Agency of the Year" from Digiday, the Shorty Award for Best Overall Facebook Presence, and the Lovie Award for Best Viral Video. Maffick's film about "fast fashion" was recently selected for the Los Angeles Fashion Film Festival and the United Nations Association Film Festival. *Id.*

Given that none of Facebook's own criteria for determining whether a social media provider is state-controlled media supported the conclusion that Maffick is controlled by the Russian state, which it is not, Maffick asked Facebook to remove the Notice from its pages immediately and, in any event, to respond to its June 30 letter by July 7, 2020. *Id.*

Facebook did not respond. On July 8, 2020 Maffick wrote to Facebook again, asking that it immediately remove the false Russia state-controlled media designation from its pages and respond to the June 30 letter by no later than July 15, 2020. *Id.* at ¶ 3. By July 14, 2020, when Facebook still had not responded to Maffick's repeated outreach, Maffick reached out again to a contact at

TroyGould
PC

- 0.0

Facebook's legal department.  *Id.* at ¶ 4.  Finally, on July 15, 2020, Facebook wrote to Maffick indicating that a response to the June 30 letter would be forthcoming.  *Id.*

On July 20, 2020, Facebook finally responded to Maffick's letter.  *Id.* at ¶ 5.  Facebook's outside counsel wrote to indicate that Facebook was not willing to take down the Notice.  Instead, Facebook proposed that Maffick resolve its dispute over the false Russia state-controlled media designation through Facebook's internal appeal process.  *Id.*  Facebook noted that Maffick had initiated an appeal on June 30, 2020, marking the first time Facebook had ever acknowledged it had even received Maffick's appeal.  *Id.*

Maffick wrote back to Facebook on July 21, 2020, indicating its willingness to utilize the Facebook appeal process, if Facebook would agree to remove the Notice from Maffick's pages during the pendency of the appeal, provide Maffick with a point person with whom to communicate about the appeal, and agree to a time period within which it would complete the appeal.  *Id.* at ¶ 6.  Maffick expressed its concern about the efficacy of the appeal process without these protections, in light of its past experiences with Facebook's slow response or non-response, including in connection with the dispute that is the subject of this case.  *Id.*

On July 24, 2020, Facebook's counsel wrote to reject each of Maffick's proposals, insisting instead that Maffick participate in a "black box" appeal, in which it submitted documentation to Facebook without any discussion about whether the documentation was sufficient, explanation of what else might be needed, or opportunity to supplement, and waited for an indefinite period of time for any response from Facebook, which would, of course, be judging the propriety of its own decisions.  *Id.* at ¶ 7.

Facebook's false designation of Maffick's social media pages as "Russia state-controlled media" has had a devastating effect on Maffick's reputation and business opportunities and relationships.  *See* Naouai Decl. at ¶ 25.  Maffick's monetization from its Facebook pages for July has dropped by 50% from its monthly average for 2020.  *Id.*  Maffick is also seeing a marked decrease in viewership.  *Id.*  Tubular Labs, which tracks activity on social media, ranked Maffick's "In the Now" in the top ten U.S. Facebook pages for news and politics for May and June 2020,

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S EX PARTE

- 0.0

based on numbers of views. Maffick expects that ranking to fall significantly for July. *Id.* Maffick has already received a report indicating that its "reach," a metric that measures the number of people who encounter social media content, is down 74% for July. *Id.*

**III.    LEGAL ARGUMENT**

**A. Legal Standard for Temporary Restraining Order**

The standard for issuing a temporary restraining order ("TRO") is similar to the standard for issuing a preliminary injunction and requires that the party seeking relief show either (1) a combination of likelihood of success on the merits and the possibility of irreparable harm, or (2) that serious questions going to the merits are raised and the balance of hardships tips sharply in favor of the moving party. *Immigrant Assistance Project v. INS*, 306 F.3d 842, 872 (9th Cir. 2002). These formulations represent two points on "a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." *Dep't of Parks & Rec. v. Bazaar Del Mundo, Inc.,* 448 F.3d 1118, 1123 (9th Cir.2006). The Court must also consider the competing interests and the effect on each party of granting or withholding relief and find that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 24 (2008).

**B. Maffick is Likely to Succeed on the Merits of Its Libel Claim**

"Defamation is an invasion of the interest in reputation. The tort involves the intentional publication of a statement of fact that is false, unprivileged, and has a natural tendency to injure or which causes special damage." *Smith v. Maldonado*, 72 Cal.App.4th 637, 645 (1999). The Civil Code defines libel, one of the two forms of defamation as, a false and unprivileged publication by writing… or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation." Cal. Civ. Code § 45. Facebook's false designation of Maffick's Facebook pages as "Russia state-controlled media" clearly fits the definition.

**TroyGould PC**

-  0.0

*First*, Facebook published the Notice to the public in general by posting it on Maffick's Facebook pages. Moreover, Facebook publishes the same notice every time Maffick shares a post on any of its pages, including on sponsored and e-commerce posts offering merchandise for sale.

*Second*, it is clear, based on the evidence that Maffick has submitted to this Court, that the Notice is false. Maffick LLC is a Delaware company and controlled, operationally and editorially by United States citizens who live and work in Los Angeles. *See* Naouai Decl. at ¶¶ 2-3. Maffick's editorial decisions are informed by analytics concerning viewer preferences and are made by Maffick's leadership in Los Angeles. *Id.* at ¶ 9. No evidence suggests that the Russian government or any Russian governmental entity or official has any role in editorial decision making at Maffick. Ruptly GmbH, which is a subsidiary of RT, is a part owner of the now-inactive German company, Maffick Media GmbH, but Ruptly did not own or operate Soapbox, Waste-Ed, or In the Now. *Id.* at ¶ 15. Regardless, Maffick and its social media pages have been owned and editorially controlled by Maffick LLC and its sole shareholder, Anissa Naouai, who is a U.S. citizen, for the past year. *Id.* at ¶16. Indeed, as noted above, none of the criteria that Facebook uses to determine editorial control of a social media page supports a finding that the Russian government controls Maffick's pages. *See* Ulin Decl. at Exhibit 1.

It is an essential element of defamation that the publication consists of a false statement of fact rather than opinion. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339-40 (1974). But a statement of opinion may be actionable "'if it implies the allegation of undisclosed defamatory facts as the basis for the opinion.'" *Okun v. Super. Ct*, 29 Cal.3d 442, 451-52 (1981). "Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18–19 (1990). Here, there can be no question that the Notice constitutes a false statement of fact by Facebook. On its face, Facebook asserts that Maffick is "Russia state-controlled," which it has explained means what the terms suggest – that Maffick is wholly or partially under the editorial control of the Russian government. Even if Facebook characterizes the Notice as a statement of its opinion with respect to editorial

- 0.0

control at Maffick, at best, that is a statement of opinion that implies the false factual assertion that Maffick is controlled by the Russian government, which is still actionable defamation.

*Third*, the defamatory character of the Notice is similarly obvious. Facebook itself explained that the purpose of the "state-controlled media" designation is "to provide an extra layer of protection against various types of foreign influence in the public debate ahead of the November 2020 election in the US." *See* RJN at Exhibit 1. The Notice thus falsely identifies Maffick as the sort of foreign government-controlled social media provider that poses a threat to the integrity of the upcoming presidential election campaign, akin to social media companies actually affiliated with the Russian and Chinese governments that were similarly labeled and others from Iran and North Korea. *Id.* at Exhibits 1-2.

To the extent the Court has any doubt about the defamatory character of the Notice, it need only consider the debilitating effect it had on Maffick's monetization of its Facebook content, which has been cut in half since Facebook began publishing the Notice, or Maffick's viewership and "reach," which have also dropped considerably. *See* Naouai Decl. at ¶ 25. The Court could also review the negative, public comments of visitors to Maffick's Facebook pages in response to the Notice. *See* Naouai Decl. at Exhibit 4. To the extent the Court requires proof of special damage resulting from Facebook's publication of the Notice, this same evidence supports a finding that Maffick has suffered and is likely to continue to suffer provable damages as a result of Facebook's publication of the false statement that Maffick is "Russia state-controlled media."

*Finally*, the Notice does not fit within the categories of statements that are privileged under Civil Code §47 and thus is not exempt from giving rise to defamation liability.[1] Maffick thus

---

[1] Facebook may argue that it is commenting on a matter of public concern – foreign governmental influence on U.S. elections through social media – and that Maffick is a public figure, inasmuch as it operates Facebook pages that get millions of views. As a result, Facebook may contend under the rules of *New York Times v. Sullivan*, 376 U.S. 254, 279–80 (1964), and *Gertz*, 418 U.S. at 347, 349, that Maffick must prove "actual malice" in order to prevail on its defamation claims. That argument should fail for two reasons. *First*, the actual malice rule of *New York Times* and *Gertz* is a protection against the recovery of damages in certain circumstances. *See Dun & Bradstreet, Inc. v. Greenmoss Builders,* 472 U.S. 749, 756 (1985). It does not prevent the imposition of injunctive relief, where appropriate, and therefore should have no bearing on this *ex parte* application. *Second*, to the extent the Court requires Maffick to prove actual malice in order
(Continued...)

**TroyGould PC**

- 0.0

establishes all of the elements of a defamation claim and is likely to prevail on the merits of its libel claim.

**C. Maffick Is Likely to Succeed on the Merits of its Lanham Act Claim**

Section 43(a) of the Lanham Act provides a civil claim where a person:

> (1) …on or in connection with any goods or services… uses in commerce… any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person….

15 U.S.C. § 1125(a)(1)(A).

Facebook's conduct fits squarely within the statutory prohibition. Specifically, by stating to the public that Maffick is "Russia state-controlled media," which Facebook says means that Maffick is under the editorial control of the Russian government, Facebook made a false representation of fact. Facebook also falsely represented that the Facebook criteria support the conclusion that Maffick is "Russia state-controlled media," when they point to the opposite conclusion. Facebook's false factual representations are likely to cause confusion about the origin or sponsorship of aspects of Facebook's social media service. They are likely to create confusion about whether pages Facebook serves through its social media platform originate with, or are sponsored or approved by, the Russian government. That constitutes an actionable claim under the Section 43(a)(1)(A).

_____

to obtain a TRO, Maffick can meet that standard. Actual malice in this context means that the defendant published the defamatory statement "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times*, 376 U.S. at 280. Here, Maffick informed Facebook before it ever published the Notice that its ownership information about Maffick was obsolete, that Maffick is not owned by Maffick Media GmbH, and that Maffick has been owned by a Delaware LLC for a year and is controlled, operationally and editorially, by United States citizens, who live and work in Los Angeles. Facebook nevertheless published the Notice and continues to publish it daily, even when confronted with evidence from Maffick that it is false. At the very least, under these circumstances, Facebook has an obligation to investigate the truth or falsity of its assertion that Maffick is "Russia state-controlled media," which it would know is false, if it undertook the investigation.

The Supreme Court has made clear that Maffick's Section 43(a) claim falls within the broad ambit of unfair competition prohibited by the statute. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 570 U.S. 118, 131 (2014) (noting that the Lanham Act provides that one of its purposes is "to protect persons engaged in… commerce against unfair competition") (quoting 15 U.S.C. §1127); *accord Presley's Estate v. Russen*, 513 F. Supp. 1339, 1376 (D.N.J. 1981) (Section 43(a) provides "broad protection against various forms of unfair competition and false advertising" by specifically prohibiting false or misleading factual statements concerning commercial products). In *Lexmark*, the Court held that to come within the zone of interests for a claim under Section 43(a), "a plaintiff must allege an injury to a commercial interest in reputation or sales, 579 U.S. at 131-32. Those are precisely the injuries that Maffick alleges it suffered as a result of Facebook's false representations about the origin of certain social media pages it serves over its platform.

The Court further emphasized that a Section 43(a) plaintiff must establish proximate causation, in the sense that its "economic or reputational injury flow[s] directly from the deception wrought by the defendant[]" and noted that "that occurs when deception of consumers causes them to withhold trade from the plaintiff." *Id.* at 133. Here again, Maffick alleges that its reputational harm and loss of business opportunities and relationships resulted from Facebook's false designation of the origin of Maffick's pages as "Russia state-controlled media." Indeed, Maffick's monetization has fallen 50% since Facebook first published the false Notice and the reach of its social media pages has dropped even more steeply. *See* Naouai Decl. at ¶ 25. This is exactly the sort of claim the Supreme Court characterized as actionable under Section 43(a). *See Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 31-32 (2003) (Section 43(a) prohibits misrepresentations of the origin of goods or services, meaning their "source" or "producer," that "deceive consumers" or "impair a [plaintiff's] goodwill"); *accord Proctor & Gamble Co. v. Haugen*, 222 F.3d 1262, 1271-73 (10th Cir. 2000) ("It is [ ] apparent, in the context of the Act's broad purpose of proscribing unfair competition… that Congress did not intend to narrowly limit [actionable] 'commercial activities,' but rather intended to encompass those activities which

TroyGould
PC

- 0.0

do not solely involve the provision of services or the production of goods"); *Fish Kiss LLC v. North Star Creations, LLC*, 2018 WL 3831335 (D.N.J. Aug. 13, 2018) (false assertion that defendant's products were "Made in USA" was actionable unfair competition under Section 43(a)).

It bears emphasis that Facebook made public statements about Maffick and the social media pages of 17 other entities precisely in order to promote the image of Facebook as a responsible social media platform, at a time when it has been under scrutiny by the press and the federal government concerning whether it is taking sufficient actions to preserve the integrity of U.S. elections from improper social media influence by foreign governments. When Facebook states publicly that it labels state-controlled media entities in order "to provide an extra layer of protection against various types of foreign influence in the public debate ahead of the November 2020 election in the US," it is therefore promoting its own commercial interests and business reputation every bit as much as it is taking action to advance election integrity. The false Notice Facebook places on Maffick's social media pages and posts is thus part of a campaign of commercial speech, which provides an additional basis for finding that it is subject to regulation under the Lanham Act as unfair competition. *See Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 962-69 (2002) (manufacturer's public statements about working conditions at its factories were commercial speech intended to promote its commercial interests and subject to scrutiny under unfair competition laws).[2]

### D. Maffick is Likely to Succeed on the Merits of its California UCL Claim

California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*, prohibits (1) unlawful, unfair, or fraudulent business acts or practices, and (2) unfair, deceptive, untrue, or misleading advertising. *Lippitt v. Raymond James Fin. Servs., Inc.*, 340 F.3d 1033 (9th Cir. 2003). A defendant violates the UCL when its business conduct is (1) proscribed by law, (2)

---

[2] For the same essential reasons, Facebook's falsely labeling Maffick as "Russia state-controlled media" as part of a campaign intended to promote Facebook's image as a responsible social media company also violates Section 43(a)(1)(B) of the Lanham Act, which prohibits statements "in… promotion [that] misrepresent[ ] the nature, characteristics, qualities, or geographic origin of his or her or another person's… commercial activities[.]"

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S EX PARTE

unfair, meaning the harm to the victim outweighs any benefit, or (3) fraudulent, meaning it is likely to deceive members of the public. *See id.* The Ninth Circuit has consistently held that state law claims of unfair competition and claims under the UCL are at least "substantially congruent to claims made under the Lanham Act." *Cleary v. News Corp.*, 30 F.3d 1255, 1262-63 (9th Cir. 1994). And the Supreme Court has noted that the "overall law of unfair competition" is even broader than those specific instances of unfair trade practices prohibited by the Lanham Act. *Dastar*, 539 U.S. at 29. The tort of unfair competition is highly flexible and gives courts the equitable power "to create remedies in new situations, whether the judge labels the law applied as 'unfair competition' or some other tort." 1 J. Thomas McCarthy, *Trademarks & Unfair Competition* § 1:16 (5th ed. 2020). Under these precedents, Maffick's UCL claim is likely to succeed for the same reasons as its Lanham Act claims. Moreover, because the UCL reaches a broader range of false and harmful statements about another party's business, Maffick is likely to succeed under the UCL for that additional reason, as well.

### E. Maffick Is Likely to Prevail on Its Interference with Prospective Economic Advantage Claim

The California Supreme Court has recognized the tort of unjustified, intentional and wrongful interference with the prospective economic advantage of another, even in the absence of a breach of contract. *Della Penna v. Toyota Motor Sales, U.S.A., Inc.,* 11 Cal.4th 376, 392-93 (1995). The requirement of interference by "unlawful and unjustified means" is satisfied by an act of defamation and other forms of tortious conduct, such as unfair competition. *Savage v. Pacific Gas & Electric Co.,* 21 Cal.App.4th 434, 449 (1993).

The elements of intentional interference with prospective economic advantage are an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; the defendant's knowledge of the existence of the relationship; the defendant's intentional acts designed to disrupt the relationship; actual disruption of the relationship; and economic harm to the plaintiff proximately caused by the defendant's acts. *Della Penna,* 11 Cal.4th at 412-13 (Mosk, J., concurring). Maffick satisfies all of them.

TroyGould
PC

- 0.0

Maffick has presented evidence of its relationships with millions of users on Facebook – its channel, In the Now, alone has 4.8 million followers. *See* Naouai Decl. at ¶ 6. Maffick has substantially monetized its social media pages through advertising and agreements and strategic partnerships with various e-commerce vendors and is expanding its paid partnerships, especially with companies producing sustainable and eco-friendly product lines. *Id.* at ¶¶ 5, 26. As a result of Facebook's false designation of Maffick's social media pages as "Russia state-controlled media," Maffick's viewer have been misled, Maffick's monetization from its Facebook pages for the month of July 2020 dropped by 50% and its viewership and "reach" have decreased dramatically. Facebook's interference is thus causing Maffick severe financial and reputational harm. *Id.* at ¶¶ 24-25.

Facebook, for its part, knows that Maffick has relationships with Facebook users and that it monetizes its social media page through Facebook's own processes. Maffick's entire business model is based significantly upon engagement with users and advertisers on Facebook and Instagram. Moreover, prior to filing suit, Maffick advised Facebook of the reputational and business harms that Facebook's actions were causing, but Facebook declined to remove the Notice.

Facebook doubtless knew that labeling Maffick as "Russia state-controlled media" would disrupt Maffick's existing and prospective economic relations. Maffick's harms were foreseeable and Facebook's interference was intentional. It wanted to affect Maffick's audience's understanding of whether Maffick was controlled by the Russian government and did not change its tactics, even after Maffick presented evidence that it is an independent, U.S.-based company. The evidence thus establishes all of the elements of a claim for interference with prospective economic advantage.

### F. Maffick Would Suffer Irreparable Harm in the Absence of a TRO and the Balance of Equities Supports Entry of an Injunction

A TRO will protect Maffick from immediate an irreparable harm to its reputation and its business relationships and opportunities. In just the first weeks since Facebook placed its false Notice on Maffick's social media pages, Maffick's monetization from those pages has already dropped by 50% from its monthly average for 2020. Maffick's social media pages are likewise

**TroyGould PC**

- 0.0

losing viewers and "reach" and comments on the pages indicate that visitors have strong negative reactions to the false "Russia state-controlled media" designation. *See* Naouai Decl. at ¶¶ 24-25. Courts commonly enjoin unlawful practices that threaten just this sort of loss of control of business reputation, loss of customers and damage to goodwill. *See, e.g.*, *Herb Reed Enter., LLC v. Florida Entm't Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013) (loss of control over

business reputation and damage to goodwill constitutes irreparable harm); *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush and Co., Inc.,* 240 F.3d 832, 841 (9th Cir. 2001) (evidence of threatened loss of prospective customers or goodwill supports finding of irreparable harm).

     Balanced against Maffick's demonstrated risk of immediate and irreparable harm that cuts to the heart of its business, Facebook's burdens involve removing the Notice from Maffick's social media pages and posts – a process that presumably can be achieved with a few keystrokes – and no longer publishing a false statement that Maffick is under the editorial control of the Russian government. Those are burdens that the law imposes and are not cognizable in the balance of hardships analysis. *See Reflex Media, Inc. v. Endeavor Standard SDN. BHD.*, 2019 WL 6792792, at *4 (C.D. Cal. Aug. 19, 2019) ("Defendants would suffer no harm by being required to comply with existing law.").

     Facebook may argue that the First Amendment precludes entry of an injunction against libel, particularly at this stage in the proceedings. *See Balboa Island Village Inn, Inc. v. Lemen*, 40 Cal. 4th 1141, 1155-56 (2007) . But "the general rule that a defamation may not be enjoined does not apply in a circumstance… in which an injunction is issued to prevent a defendant from repeating statements that have been judicially determined to be defamatory." *Id.* at 1157. That is exactly what Maffick seeks here – an injunction preventing Facebook from repeatedly posting the false Notice on Maffick's social media pages and continuing to post the notices that have already been posted, all of which are verbatim identical. Of course, it is axiomatic that "there is no constitutional value in false statements of fact," *Gertz*, 418 U.S. at 339, like the Notice. Moreover, as discussed above, when Facebook comments on public issues in the context of an effort to

**TroyGould PC**

- 0.0

promote its social media platform, that is commercial speech that is subject to lesser constitutional protection. *See Kasky*, 27 Cal. 4th at 962-69.

To be sure, *Balboa Island* distinguished preliminary injunctions from those issued after statements are found defamatory at trial and found that the First Amendment generally prevents preliminary injunctions against defamatory speech, but courts have issued preliminary injunctions against false and defamatory speech where they were narrowly tailored, easily enforced and implicated other important policies. *See San Antonio Cnty. Hosp. v. S. Cal. Dist. Council of Carpenters*, 125 F.3d 1230, 1238-39 (9th Cir. 1997) (upholding an injunction requiring union to take down a banner displayed prominently in front of a hospital that "was so misleading as to be fraudulent"); *Aguilar v. Avis Ren A Car System, Inc.*, 21 Cal. 4th 121, 138-42 (1999) (injunction preventing continuing use of racial epithets in the workplace upheld in light of public policy concerns and plaintiffs' legal and constitutional interests in being free of racial discrimination); *Martin v. Reynolds Metals Co.*, 224 F. Supp. 978, 984 (D. Or. 1963) ("Unlike similar cases where equitable relief was denied, the court's injunction in this case would be both easy to carry out and easy to enforce—take down the sign, cease and desist until the claim is appropriately adjudicated.").

Maffick's requested TRO is similarly limited and easily enforced. Maffick asks only that Facebook remove the Notice, which makes a false statement that Maffick is editorially controlled by the Russian government, from its social media pages – a command similar to ordering a union to take down a false banner. The injunction would address only a single posting that the Court would have found is likely to be false. It would eliminate that false statement from the public discourse about election integrity, eliminate confusion about the source and bona fides of Maffick's postings, and vindicate Maffick's free speech interest in not being compelled to make false statements about its editorial control on its own social media pages. And it would protect Maffick from irreparable harm to its reputation and business interests. Under these circumstances, the limited TRO Maffick requests is warranted.

Moreover, Maffick's TRO application is not based solely on its libel claim. Maffick also seeks an injunction based on its Lanham Act and UCL claims. Both claims arise from Facebook's unfair business practices and both statutes expressly authorize injunctive relief to remedy violations. *See* 15 U.S.C. § 1116(a) (authorizing injunctive relief for violations of Section 43(a) of the Lanham Act); Cal. Bus. & Prof. Code § 17203 ('Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined"). Similarly, upon a showing of likelihood of success, injunctive relief is a preferred remedy for the tort of interference with business relations, where it prevents businesses from losing customers and employees and having their viability threatened during the pendency of litigation to vindicate their interests. Even if the Court is reluctant to issue an injunction on Maffick's libel claim, it should nonetheless issue the limited injunction requested to protect Maffick from further irreparable harm resulting from Facebook's other legal violations.

### G. A TRO Would Serve the Public Interest

Maffick's requested injunction would also serve the public interest by eliminating confusion caused by false information published by Facebook about Maffick's editorial control and by eliminating unfair competition from the social media marketplace. The public clearly has an interest in truthful information about social media sources, especially in an election year, and it likewise has a strong interest in assuring that unfair competition laws, which ultimately exist to benefit consumers as well as commercial entities, are enforced. *See Brown v. Electronic Arts, Inc.,*725 F.3d 1235, 1239 (9th Cir. 2013) (Section 43(a) "protects the public's interest in being free from consumer confusion about affiliations and endorsements").

### H. The Court Should Set an Early Trial Date and Order Expedited Discovery

Regardless of whether the Court enters the requested TRO, and especially if it determines that the First Amendment creates a barrier to interim injunctive relief, this Court should set an early trial date in this matter and order expedited discovery. With respect to discovery, Rule 26 gives the Court broad discretion to accelerate the timing pursuant to its authority to manage the discovery process. *See* Fed. R. Civ. P. 26(d)(1); 1993 Advisory Committee Notes to Fed. R. Civ. P. 26(d)

**TroyGould PC**

- 0.0

("Discovery can begin earl[y] if authorized … by… order").  The Court applies the conventional, flexible standard of good cause in evaluating a request for expedited discovery.  *Semitool, Inc. v. Tokyo Electron America, Inc.* 208 F.R.D. 273, 276 (N.D. Cal. 2002).  Good cause is frequently found in cases involving unfair competition.  *Id.*

This case turns on one principal factual question – whether Facebook's designation of Maffick as "Russia state-controlled media" was true or false.  Given the immediate and irreparable consequences of that designation for Maffick's business, Maffick respectfully submits that the parties should be permitted to conduct discovery immediately, with a particular focus on the evidentiary basis, if any, for Facebook's designation.  Maffick further requests that the case be set for early trial, no later than the beginning of the new year, or as soon thereafter as the Court's calendar will allow.  The consequences of Facebook's false statements about Maffick being "Russian state-controlled media" are too serious to require Maffick to wait indefinitely to resolve its claims and pursue injunctive relief that will remove the Notice from its social media pages and protect its business from compelled speech, libelous falsehood, and unfair competition.

## IV.   CONCLUSION

For all these reasons, the Court should enter the requested TRO, enjoining Facebook from continuing to post the false Notice on Maffick's social media pages and posts and should separately allow the parties to conduct discovery immediately and set this matter for an early trial.

Dated:  July 29, 2020                                    TROYGOULD PC


                                                        By:   */s/ John Ulin*
                                                              _____
                                                              JOHN ULIN
                                                              Attorneys for Plaintiff
                                                              MAFFICK LLC

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S EX PARTE

**TroyGould PC**

-  0.0