JONATHAN H. BLAVIN (State Bar No. 230269)
jonathan.blavin@mto.com
ROSEMARIE T. RING (State Bar No. 220769)
rose.ring@mto.com
MARIANNA MAO (State Bar No. 318070)
Marianna.Mao@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street, Twenty-Seventh Floor
San Francisco, California 94105-2907
Telephone:     (415) 512-4000
Facsimile:     (415) 512-4077

JONATHAN KRAVIS (*pro hac vice* application pending)
Jonathan.kravis@mto.com
ZOE BEDELL (*pro hac vice* application pending)
zoe.bedell@mto.com
MUNGER, TOLLES & OLSON LLP
1155 F Street, NW, 7th Floor
Washington, DC  20004-1361
Telephone:     (202) 220-1100
Facsimile:     (202) 220-2300

Attorneys for Defendant
FACEBOOK, INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| MAFFICK LLC, a Delaware limited liability company,<br><br>                    Plaintiff,<br><br>          vs.<br><br>FACEBOOK, INC., a Delaware corporation, and Does 1-10, inclusive.<br><br>                    Defendants. | Case No. 3:20-cv-05222-JD<br><br>**DEFENDANT'S OPPOSITION TO PLAINTIFF'S *EX PARTE* APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION**<br><br>_____ |

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION .................................................................................................. 1

II.  BACKGROUND .................................................................................................. 1

    A.  The History of Maffick Media ................................................................ 1

    B.  The Creation of Plaintiff Maffick LLC .................................................. 3

    C.  Facebook's Efforts to Protect 2020 U.S. Elections and Improve Transparency ....... 4

    D.  Facebook Labels Maffick's Pages Russian State-Controlled Media ...................... 5

III.  STANDARD ........................................................................................................ 6

IV.  ARGUMENT ........................................................................................................ 6

    A.  The Proposed TRO Is an Unconstitutional Prior Restraint ......................... 6

    B.  Maffick Has Not Established Imminent Irreparable Harm ..................... 10

    C.  Maffick Is Unlikely To Prevail on the Merits ....................................... 14

        1.  The Statement At Issue Is Constitutionally-Protected Opinion ................. 14

        2.  Maffick Cannot Establish Actual Malice ................................................. 17

        3.  Maffick Has Not Established The Elements Of Its Claims ........................ 19

    D.  The Balance of Equities Weigh Against a TRO .................................... 24

    E.  A TRO Does Not Serve The Public Interest ......................................... 24

V.  CONCLUSION .................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*AboveGEM, Inc. v. Organo Gold Mgmt., Ltd.*,
  2019 WL 3859012 (N.D. Cal. Aug. 16, 2019) .......................................................................11

*AdTrader, Inc. v. Google LLC*,
  2018 WL 3428525 (N.D. Cal. July 13, 2018) .........................................................................22

*Alexander v. United States*,
  509 U.S. 544 (1993) ..............................................................................................................6, 7

*Am. Passage Media Corp. v. Cass Commc'ns, Inc.*,
  750 F.2d 1470 (9th Cir. 1985) .................................................................................................10

*Amylin Pharm., Inc. v. Eli Lilly & Co.*,
  456 F. App'x 676 (9th Cir. 2011) .............................................................................................10

*Arcsoft, Inc. v. Cyberlink Corp.*,
  153 F. Supp. 3d 1057 (N.D. Cal. 2015) ..............................................................................11, 12

*Aviation Charter, Inc. v. Aviation Research Group/US*,
  416 F.3d 864 (8th Cir. 2005) ...................................................................................................15

*Bell Atl. Bus. Sys., Inc. v. Storage Tech. Corp.*,
  1994 WL 125173 (N.D. Cal. Mar. 31, 1994) .......................................................................10, 12

*Bosley Medical Institute, Inc. v. Kremer*,
  403 F.3d 672 (9th Cir. 2005) ...............................................................................................20, 21

*Browne v. Avvo Inc.*,
  525 F. Supp. 2d 1249 (W.D. Wash. 2007) ...............................................................................15

*Brunette v. Huamne Soc'y of Ventura Cty.*,
  40 Fed. Appx. 594 (9th Cir. 2002) .............................................................................................9

*Caribbean Marine Servs. Co., Inc. v. Baldrige*,
  844 F.2d 668 (9th Cir. 1988) ...................................................................................................10

*Cleary v. News Corp.*,
  30 F.3d 1255 (9th Cir. 1994) ...................................................................................................22

*Columbia Broad. Sys., Inc. v. U.S. Dist. Ct.*,
  729 F.2d 1174 (9th Cir. 1984) ...................................................................................................7

*Compuware Corp. v. Moody's Inv'rs Servs., Inc.*,
  499 F.3d 520 (6th Cir. 2007) ...................................................................................................15

-ii-

### <u>TABLE OF AUTHORITIES</u>
(Continued)

**Page(s)**

*Damabeh v. 7-Eleven, Inc.*,
2013 WL 1915867 (N.D. Cal. May 8, 2013) ...........................................................22

*Dan Farr Prods. v. U.S. Dist. Ct. (In re Dan Farr Prods.)*,
874 F.3d 590 (9th Cir. 2017)................................................................................7

*Danaei v. Rostam*,
2017 WL 2719984 (C.D. Cal. Feb. 2, 2017) ......................................................11, 12

*Davis v. Avvo, Inc.*,
345 F. Supp. 3d 534 (S.D.N.Y. 2018) ......................................................................15

*Dodds v. Am. Broad. Co.*,
145 F.3d 1053 (9th Cir. 1998) ..................................................................................18

*Dolin v. Facebook, Inc.*,
2018 WL 2047766 (N.D. Cal. May 2, 2018) ...........................................................22

*Ebates Performance Mktg., Inc. v. Integral Techs., Inc.*,
2013 WL 75929 (N.D. Cal. Jan. 4, 2013) ................................................................12

*In re Excel Innovations, Inc.*,
502 F.3d 1086 (9th Cir. 2007) ..................................................................................12

*Forsyth v. Motion Picture Ass'n of Am., Inc.*,
2016 WL 6650059 (N.D. Cal. Nov. 10, 2016) .........................................................15

*Gertz v. Robert Welch, Inc.*,
418 U.S. 344 (1974) ..................................................................................................17

*Gold Coast Search Partners LLC v. Career Partners, Inc.*,
2019 WL 4305540 (N.D. Cal. Sept. 11, 2019).......................................................8, 9

*Harris v. City of Seattle*,
152 Fed. Appx. 565 (9th Cir. 2005) .........................................................................19

*Harte-Hanks Communications, Inc. v. Connaughton*,
491 U.S. 657 (1989) ..................................................................................................18

*Herb Reed Enters., LLC v. Florida Entmt. Mgmt., Inc.*
736 F.3d 1239 (9th Cir. 2013) ..................................................................................12

*IBiz, LLC v. City of Hayward*,
962 F. Supp. 2d 1159 (N.D. Cal. 2013) ...................................................................24

*J.K. Harris & Co., LLC v. Kassel*,
253 F. Supp. 2d 1120 (N.D. Cal. 2003) ....................................................................8

-iii-

1
2

**TABLE OF AUTHORITIES**
(Continued)

Page(s)

3
4

*Kournikova v. General Media Comms., Inc.*,
  2002 WL 31628027 (C. D. Cal. Aug. 9, 2002) ..........................................................................19

5

*Kramer v. Thompson*,
  947 F.2d 666 (3d Cir. 1991) ..........................................................................................................8

6
7

*Levine v. U.S. Dist. Ct.*,
  764 F.2d 590 (9th Cir. 1985) ......................................................................................................7, 9

8
9

*Li v. Home Depot USA Inc.*,
  2013 WL 12120065 (C.D. Cal. Jan. 7, 2013) .............................................................................13

10

*Lieberman v. Fieger*,
  338 F.3d 1076 (9th Cir. 2003) .................................................................................................19, 20

11
12

*Lilith Games (Shanghai) Co. v. UCool, Inc.*,
  2015 WL 5591612 (N.D. Cal. Sept. 23, 2015) ...........................................................................13

13

*Makaeff v. Trump University, LLC*,
  715 F.3d 254 (9th Cir. 2013) ........................................................................................................17

14
15

*Martin v. Reynolds Metals Co.*,
  224 F. Supp. 978 (D. Ore. 1963) .................................................................................................10

16
17

*Maxim Integrated Prod., Inc. v. Quintana*,
  654 F. Supp. 2d 1024 (N.D. Cal. 2009) ......................................................................................24

18
19

*Millennium Laboratories, Inc. v. Ameritox Ltd.*,
  817 F.3d 1123 (9th Cir. 2016) ......................................................................................................22

20

*Mishiyev v. Alphabet, Inc.*,
  2020 WL 1233843 (N.D. Cal. Mar. 13, 2020) ...........................................................................23

21
22

*Neb. Press Ass'n v. Stuart*,
  427 U.S. 539 (1976) ........................................................................................................................7

23

*New.Net, Inc. v. Lavasoft*,
  356 F. Supp. 2d 1071 (C.D. Cal. 2003) .........................................................................................8

24
25

*New.Net, Inc. v. Lavasoft*,
  356 F. Supp. 2d 1090 (C.D. Cal. 2004) .......................................................................................21

26
27

*NEXTracker, Inc. v. Array Technologies, Inc.*,
  2017 WL 5625926 (N.D. Cal. Nov. 22, 2017) ..............................................................................6

28

*Nichols v. Club for Growth Action*,
  235 F. Supp. 3d 289 (D.D.C. 2017) ............................................................................................20

-iv-

1

**TABLE OF AUTHORITIES**
(Continued)

2

Page(s)

3

*Obsidian Fin. Grp. v. Cox*,
    740 F.3d 1284 (9th Cir. 2014) ...................................................................................14

4

*Overstreet v. United Bhd. of Carpenters & Joiners of Am., Local Union No. 1506*,
    409 F.3d 1199 (9th Cir. 2005) ................................................................................9, 10

5

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*,
    413 U.S. 376 (1973) .................................................................................................8

6

7

*Prostar Wireless Group, LLC v. Domino's Pizza, Inc.*,
    360 F. Supp. 3d 994 (N.D. Cal. 2018) .................................................................22, 23

8

9

*Purdum v. Wolfe*,
    2014 WL 171546 (N.D. Cal. Jan. 15, 2014) ..............................................................12

10

*Rent-A-Ctr., Inc. v. Canyon Television & App. Rental, Inc.*,
    944 F.2d 597 (9th Cir. 1991) ....................................................................................10

11

12

*Resolute Forest Prod., Inc. v. Greenpeace Int'l*,
    302 F. Supp. 3d 1005 (N.D. Cal. 2017) ..................................................................7, 8

13

14

*Rice v. Fox Broadcasting Co.*,
    330 F.3d 1170 (9th Cir. 2003) ..................................................................................20

15

*RingCentral, Inc. v. Nextiva, Inc.*,
    2020 WL 4039322 (N.D. Cal. July 17, 2020) ...........................................................23

16

17

*Saad v. Am. Diabetes Ass'n*,
    2015 WL 751295 (D. Mass. Feb. 23, 2015) ................................................................7

18

19

*Sammartano v. First Judicial District Court, in and for Carson City*,
    303 F.3d 959 (9th Cir. 2002) ....................................................................................25

20

*San Antonio Community Hospital v. Southern California District Council of
    Carpenters*,
    125 F.3d 1230 (9th Cir. 1997) ...............................................................9, 10, 18, 19

21

22

23

*Skidmore as Tr. for Randy Craig Wolfe Tr. v. Zeppelin*,
    952 F.3d 1051 (9th Cir. 2020) ..................................................................................20

24

*Stackla, Inc. v. Facebook Inc.*,
    2019 WL 4738288 (N.D. Cal. Sept. 27, 2019) ................................................... *passim*

25

26

*Steep Hill Labs, Inc. v. Moore*,
    2018 WL 1242182 (N.D. Cal. Mar. 8, 2018) ............................................................7, 8

27

28

**TABLE OF AUTHORITIES**
(Continued)

**Page(s)**

*Unelko Corp. v. Rooney,*
 912 F.2d 1049 (9th Cir. 1990) ..................................................................8

*Utah Lighthouse Ministry v. Foundation for Apologetic Information and Research,*
 527 F.3d 1045 (10th Cir. 2008) ..........................................................20, 21

*Weiner v. San Diego Cty.,*
 210 F.3d 1025 (9th Cir. 2000) ................................................................14

*Worrell-Payne v. Gannett Co., Inc.,*
 49 Fed. Appx. 105 (9th Cir. 2002) .........................................................19

*ZL Techs., Inc. v. Gartner, Inc.,*
 709 F. Supp. 2d 789 (N.D. Cal. 2010) ........................................15, 16, 17

**STATE CASES**

*Aguilar v. Avis Rent A Car System, Inc.,*
 980 P. 2d 846 (1999) ...............................................................................9

*Balboa Island Village Inn, Inc. v. Lemen,*
 40 Cal. 4th 1141 (2007) ...........................................................................9

*Botos v. Los Angeles Cty. Bar Ass'n,*
 151 Cal. App. 3d 1083 (1984) ................................................................14

*Castle Rock Remodeling, LLC v. Better Bus. Bureau of Greater St. Louis, Inc.,*
 354 S.W.3d 234 (Mo. Ct. App. 2011) .....................................................15

*Copp v. Paxton,*
 45 Cal. App. 4th 829 (1996) ...................................................................20

*Evans v. Evans,*
 162 Cal. App. 4th 1157 (2008) .................................................................8

*Steiner v. Superior Court,*
 220 Cal.App.4th 1479 (2013) ...................................................................7

**FEDERAL STATUTES**

15 U.S.C. § 1125(a)(1) .................................................................................20

**STATE STATUTES**

California Business and Professions Code § 17200 .......................................22

-vi-

## I.      INTRODUCTION

In its application for a temporary restraining order ("TRO"), Plaintiff Maffick LLC ("Maffick") asks this Court to impose a prior restraint on Facebook's First Amendment protected speech.  Maffick, which has been majority owned by and has deep ties to the Russian news network RT—an entity described by the U.S. Director of National Intelligence as the "Kremlin's principal international propaganda outlet"[1]—alleges that this extraordinary remedy is warranted by Facebook's application of its state-controlled media entity label to Maffick's Facebook Pages.[2] Mem. of Points & Authorities, ECF No. 3-1 at 2 ("Mem.").

Maffick comes nowhere close to overcoming the "heavy presumption" that its request for a prior restraint on Facebook's speech is facially unconstitutional.  Nor does Maffick show, or even assert, the necessary irreparable harm to warrant such relief—i.e., the imminent destruction of its business.  Maffick likewise fails to show a likelihood of success on the merits.  Facebook's subjective judgment, based upon numerous criteria, that Maffick's Pages should receive its state-controlled media entity label is a non-actionable statement of opinion.  And Maffick, as a limited purpose public figure, fails to show actual malice or satisfy the other basic elements of its claims.

Finally, the requested TRO is squarely *adverse* to the public interest.  Beyond violating the First Amendment, the requested relief—to use Maffick's own words—would directly undercut Facebook's efforts "to preserve the integrity of U.S. elections from improper social media influence by foreign governments."  Mem. 16.  For these reasons and those below, the TRO should be denied.

## II.     BACKGROUND

### A.      The History of Maffick Media

According to the U.S. Senate Select Committee on Intelligence, "[i]n 2016, Russian operatives … used social media to conduct an information warfare campaign designed to spread disinformation and societal division in the United States."  Blavin Decl., Ex. C at 3.  Among the Committee's recommendations was "that social media companies provide users with [g]reater

---

[1] Declaration of Jonathan H. Blavin ("Blavin Decl."), Ex. A at 3.

[2] Or as Maffick put it on Twitter, "It's so official: We're suing Facebook, bitches!"  *Id.*, Ex. B.

-1-

transparency about activity occurring on their platforms . . . [, g]reater context for users about why they see certain content … and, [c]omplete and timely public exposure of malign information operations." *Id*. at 79.

On February 15, 2019, Facebook suspended Pages on its platform "run by Maffick Media, a company whose majority shareholder is Ruptly, a subsidiary of RT"—formerly known as "Russia Today"—"which is funded by the Russian government."  Blavin Decl., Ex. A at 1.  "Ruptly's stated goals include to build and extend the 'core strengths and values of [its] parent company RT.' According to RT Editor-in-Chief Margarita Simonyan, those strengths include serving as an 'information weapon' against the Kremlin's adversaries." *Id*., Ex. D at 3.  Facebook's suspension of Maffick Media's Pages garnered widespread public attention. *E.g., id*., Exs. E-F.  In response, RT's editor-in-chief wrote that "this project is funded from Russia" and "Facebook has blocked our projects with billions of views!!!" *Id*., Ex. E at 2, 5.  In a statement on its website (which has since been taken down and now automatically redirects to Plaintiff's site), Maffick Media similarly stated that "[t]he government that helps fund our company is Russia" and "CNN pressured Facebook into unprecedented censorship in a desperate attempt to milk ratings by stoking hysteria over Russia." *Id*., Ex. G.  And in a video posted to Ruptly's YouTube channel with the title, "Russia: Lavrov slams Facebook for blocking In The Now, rules out reciprocal measures," Russian Foreign Minister Sergei Lavrov commented in a press conference on Facebook's actions regarding Maffick Media.[3]

Ten days after suspending Maffick Media's Facebook Pages, Facebook restored the Pages when Maffick Media agreed to add disclaimers to them disclosing the company's affiliations with the Russian government.  Blavin Decl., Ex. H.  After the restoration, Maffick Media's CEO, Anissa Naouai, said in a video, "so an alliance of neocons and centrists and former intelligence officials funded by the U.S. government threw a temper tantrum to get CNN to encourage Facebook to censor us?  That's creepy as [expletive]."[4]  She also cited to a Buzzfeed exposé about Maffick Media's In The Now channel titled, "This Quirky New Viral Video Channel Is Funded By The

---

[3] *See* https://www.youtube.com/watch?v=lf9nWhcQR20.

[4]  https://twitter.com/camilateleSUR/status/1101962357419507712 at 1:31 to 1:44.

Russian Government" and described it as "revealing what was pretty much widely known."[5]

### B.     The Creation of Plaintiff Maffick LLC

Five months later, on July 29, 2019, Plaintiff Maffick LLC ("Maffick") was registered as a Delaware limited liability company.  Naouai Decl. ¶ 2.  Ms. Naouai, who was previously Maffick Media's CEO, states that she is now Maffick's "sole member, manager and CEO."  *Id.*  Ms. Naouai herself has deep ties to RT: following her studies in Moscow, she "worked as a correspondent for RT beginning in 2006," later hosted the nightly show "In The Now" on RT (which is now a Maffick property), and "continued her relationship with the channel even during Russia's intervention in Ukraine and what the U.S. Director of National Intelligence said was RT's involvement in Russian meddling in the 2016 US elections."  Blavin Decl., Ex. A at 3; Ex. I.  The Facebook Pages at issue in this case contain the same content previously provided by Maffick Media: Soapbox, In The Now, and Waste-Ed.  "Maffick Media" also remains a continuing presence.  For example, the contact e-mail addresses listed on the In The Now, Soapbox, and Waste-Ed Pages are hello@maffick.media, soapbox@maffick.media, and waste-ed@maffick.media respectively.  *Id.*, Ex. J.  The domain maffick.media is registered to Plaintiff.  *Id.*, Ex. K.

Maffick's channels "often play on tensions in the US" and "publish videos critical of US and NATO foreign policy, American waste habits, and news issues like Russia being barred from the 2018 Winter Olympics."  *Id.*, Ex. E at 2.  Maffick's most popular Facebook Page is In The Now, which Ms. Naouai states "is directed toward a community of mindful media consumers and is centered around important, curious and purpose-driven content." Naouai Decl. ¶ 6. EUvsDisinfo – which the European Council established in 2015 "to better forecast, address, and respond to the Russian Federation's ongoing disinformation campaigns affecting the European Union, its Member States, and countries in the shared neighbourhood" (Blavin Decl., Ex. L) – describes In The Now this way:

> In the Now, which started as a talk show on RT with an American host (RT uses international hosts to keep its ties to Russia out of plain view), provides a youthful appeal, different from the more formal attitudes in RT's news reporting, and communicates via

---

[5] *Id.* at 2:04 to 2:10.

> Facebook and Youtube. . . .  In The Now steps further away from identification with the Kremlin by adding videos with high emotional and entertainment value to the output.  This becomes bait to attract audiences which would otherwise not be attracted by highly political stories (RT has a track record of mainly attracting politically interested, but marginally far-right or far-left audiences) and acts as camouflage to keep the output's ties to Russia's government at least two or three clicks away.  In The Now presents a cocktail mixing highly political stories with absolutely apolitical entertainment and emotional clickbait.

*Id.*, Ex. M at 2.

### C.    Facebook's Efforts to Protect 2020 U.S. Elections and Improve Transparency

On October 19, 2019, Facebook publicly announced new measures that it was taking to stop election interference and abuse on its platform, and to provide more transparency to users about the sources of information available on the site.  *Id.*, Ex. N at 1; Declaration of Nathaniel Gleicher ("Gleicher Decl.") ¶ 2.  Among the measures that Facebook announced was the creation of a state-controlled media entity ("SCME") label that would be added to Facebook Pages that Facebook believes are wholly or partially under the editorial control of a government.  *Id.*  Facebook identifies state-controlled media outlets by applying its own definition and standards to review those outlets' ownership, governance, sources of funding, and processes to ensure editorial independence.  *Id.* ¶¶ 3-4.  Facebook developed these standards after receiving input from more than 65 experts from around the world specializing in media, governance, human rights, and development.  *Id.* ¶ 5.

Facebook's use of its SCME label and consideration of state editorial control extends beyond merely assessing financial funding or ownership and takes into account numerous factors, including: (a) mission statement, mandate, and/or public reporting on how the organization defines and accomplishes its journalistic mission; (b) ownership structures; (c) editorial guidelines (e.g., transparency around its sources of content); (d) information about newsroom leadership and staff; (e) sources of funding and revenue; (f) governance and accountability mechanisms; (g) country-specific factors, including press freedom; and (h) open source data, such as research conducted by academics and experts.  *Id.* ¶ 7.  Facebook makes these criteria, as well as other information about the label, publicly available in a Help Center article.  *Id.*, Ex. 1.  Facebook includes a link to this article in the Page Transparency section where it applies the label.  *Id.* ¶¶ 8, 16; Blavin Decl., Ex. O.

If Facebook determines, in its own judgment, that a particular media organization warrants the SCME label based on the criteria set forth above, then Facebook will display the label in its Ad Library and on any Pages associated with that organization.  Gleicher Decl. ¶ 9.  If a media outlet believes that Facebook has applied the SCME label in error, it can submit a formal appeal to Facebook and provide additional documentation to demonstrate its editorial independence.  *Id.* ¶ 10.

**D.**     **Facebook Labels Maffick's Pages Russian State-Controlled Media**

Taking into consideration the foregoing criteria and based on the information available to it about Maffick's affiliations with the Russian state, Facebook made the judgment that Maffick is wholly or partially under the editorial control of the Russian government.  Gleicher Decl. ¶¶ 11-12.  Accordingly, on June 5, 2020, Facebook placed an SCME label on the Page Transparency sections of Maffick's In The Now, Soapbox, and Waste-Ed Facebook Pages.  *Id.* ¶ 11.  Other online platforms have applied similar labels to Maffick's content.  For example, Maffick's YouTube videos are accompanied by a statement by YouTube that "RT is funded in whole or in part by the Russian government."[6]

On June 30, 2020, Maffick sent Facebook a letter demanding that it "immediately remove the [SCME label] from all of Maffick's Facebook pages."  Declaration of John Ulin ("Ulin Decl."), Ex. 1.  On that same day, Maffick submitted an appeal via Facebook's appeals process.  Gleicher Decl. ¶ 14.  The materials that Maffick sent to Facebook in support of its appeal did not include official documents showing sources of funding, the organizational structure of Maffick's board, or the processes it employs to ensure editorial independence from the Russian state.  *Id.* ¶ 15.  Instead, those materials consisted almost entirely of self-serving, conclusory claims by Maffick that it does not meet Facebook's SCME criteria, without reliable documentation to support those claims.  *Id.*

On July 20, 2020, Facebook responded to Maffick's letter stating, *inter alia*, that from "Facebook's review of [the materials Maffick submitted with its appeal], they lack both the reliability and formality Facebook requires as part of the appeals process.  Ulin Decl., Ex. 3 at 2.

---

[6] *See, e.g.*, https://www.youtube.com/watch?v=04BZ7_eaDB0 (Soapbox YouTube channel video, dated January 5, 2020); https://www.youtube.com/watch?v=bl-BsAx7jLs (Soapbox YouTube channel video, dated February 9, 2020).

Facebook repeatedly has "encourage[d] Maffick to submit additional materials that address these issues." *Id.*; Gleicher Decl. ¶ 16.  To date, Maffick has not yet provided Facebook with these additional substantiated materials as part of its appeal of the SCME label (beyond an organizational chart that does not reflect, e.g., the existence of an editorial board).  *Id.*

On July 29, 2020, Maffick sued Facebook alleging six causes of action and seeking a temporary restraining order barring Facebook from displaying the SCME label on Maffick's Pages. Maffick requests an order to "restrain[] and enjoin[]" Facebook "from publishing any designation on social media pages owned and operated by Maffick, LLC and on posts published by Maffick LLC on said pages, indicating that Maffick is 'Russia state-controlled media.'" [Proposed] Order Granting Plaintiff's *Ex Parte* Application for a TRO, ECF No. 3-5 ("Proposed Order").

## III.     STANDARD

A temporary restraining order "is an extraordinary remedy never awarded as of right." *NEXTracker, Inc. v. Array Techs., Inc.*, No. 3:17-cv-06582-JD, 2017 WL 5625926, at *2 (N.D. Cal. Nov. 22, 2017).  A plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Id.* (internal quotation marks omitted). "Alternatively, a preliminary injunction may issue where serious questions going to the merits were raised and the balance of hardships tips sharply in plaintiff's favor, if the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest."  *Id.*

## IV.     ARGUMENT

### A.     The Proposed TRO Is an Unconstitutional Prior Restraint

Maffick's proposed order to "restrain[] and enjoin[]" Facebook "from publishing any designation" on Maffick's social media pages "indicating that Maffick is 'Russia state-controlled media'" (Proposed Order at 1) violates the First Amendment.

Maffick's requested TRO would be an unconstitutional "prior restraint" on speech.  "The term prior restraint is used 'to describe administrative and judicial orders forbidding certain communications when issued in advance of the time that such communications are to occur.'"

*Alexander v. United States*, 509 U.S. 544, 550 (1993) (emphasis omitted).  TROs and preliminary injunctions "are classic examples of prior restraints" because they are "court orders that actually forbid speech activities," including speech that has already "been shown in the past." *Id.*  A TRO or injunction that orders a party to remove statements from a website constitutes a prior restraint. *See Steep Hill Labs., Inc. v. Moore*, 2018 WL 1242182, at *14 (N.D. Cal. Mar. 8, 2018) (requested preliminary injunction ordering defendant to remove content from website in defamation suit is a "classic prior restraint[]"), *aff'd*, 744 F. App'x 443 (9th Cir. 2018); *Steiner v. Superior Court,* 220 Cal. App. 4th 1479, 1493 (2013) (court order requiring party to "remove pages from her law firm Web site" constituted "an unlawful prior restraint"); *Saad v. Am. Diabetes Ass'n*, 2015 WL 751295, at *1–2 (D. Mass. Feb. 23, 2015) (a "temporary restraining order and preliminary injunction" that would "require[] the [defendant] to remove the digital expression of concern that was published on the *Diabetes* website" is a "classic prior restraint that is presumptively invalid").

    "There is a heavy presumption against prior restraints on speech, and they are subject to the strict scrutiny standard of review." *Dan Farr Prods. v. U.S. Dist. Ct.*, 874 F.3d 590, 593 n.2 (9th Cir. 2017); *see Steep Hill Labs*, 2018 WL 1242182, at *13-14.  That is because "prior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976).  Under this standard, a requested TRO that restricts speech must be denied unless "(1) the activity restrained poses either a clear and present danger or a serious and imminent threat to a protected competing interest, … (2) the [proposed injunction] is narrowly drawn, … *and* (3) less restrictive alternatives are not available." *Levine v. U.S. Dist. Ct.*, 764 F.2d 590, 595 (9th Cir. 1985).  As the Ninth Circuit has recognized, prior restraints, "if permissible at all, are permissible only in the most extraordinary of circumstances." *Columbia Broad. Sys., Inc. v. U.S. Dist. Ct.*, 729 F.2d 1174, 1183 (9th Cir. 1984).

    Applying this test to defamation and the like claims asserted here,[7] both courts in this

---

[7] "[U]nder California law, First Amendment limitations are applicable to all claims, of whatever label, whose gravamen is the alleged injurious falsehood of a statement" and therefore "claims which are similar to defamation, such as tortious interference with contractual or prospective relationships 'are subject to the same first amendment requirements that govern actions for

District and the California Courts of Appeal consistently have held that federal and state principles require a determination at trial on the merits whether the speech at issue is actually false and defamatory before an injunction restricting the speech may be issued. *Steep Hill Labs.*, 2018 WL 1242182, at \*13 ("[W]here there has been no trial and no determination on the merits that there is actionable defamation, … the court cannot prohibit a party from making statements characterized only as 'false and defamatory.'"); *Evans v. Evans*, 162 Cal. App. 4th 1157, 1167-68 (2008).

Contrary to Maffick's assertion that the Court can make such a determination now (Mem. 19), a motion for a preliminary injunction or a temporary restraining order is not the proper forum for adjudicating the truth or falsity of an alleged defamatory statement.  As the Supreme Court has explained, the danger of issuing a preliminary injunction or temporary restraining order proscribing speech is that "communication will be suppressed…before an adequate determination that it is unprotected by the First Amendment." *Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*, 413 U.S. 376, 390 (1973).  It is only after "a jury has determined that a certain statement is libelous" that an injunction prohibiting the defendant from repeating the statement is no longer a "prior restraint." *Kramer v. Thompson*, 947 F.2d 666, 676 (3d Cir. 1991).  For this reason, courts consistently have rejected invitations like Maffick's to resolve the truth or falsity of alleged defamatory speech on a preliminary injunction.  *See, e.g.*, *Gold Coast Search Partners LLC v. Career Partners, Inc*., 2019 WL 4305540, at \*4–5 (N.D. Cal. Sept. 11, 2019) (denying motion for preliminary injunction to enjoin alleged defamatory speech and observing that a "preliminary injunction is not ideal for resolving the actual truth or falsity of Defendants' speech"); *J.K. Harris & Co. v. Kassel*, 253 F. Supp. 2d 1120, 1129 (N.D. Cal. 2003) (vacating preliminary injunction on ground that "enjoining" statements "prior to an adjudication of their truth or falsity would suppress arguably protected speech"); *New.Net, Inc. v. Lavasoft*, 356 F. Supp. 2d 1071, 1084 (C.D. Cal. 2003) ("[T]he question of the *actual* truth or falsity of Lavasoft's speech is not appropriate on this motion for *preliminary* injunctive relief.").  The same result is warranted here.

---

defamation.'" *Resolute Forest Prods., Inc. v. Greenpeace Int'l*, 302 F. Supp. 3d 1005, 1016 (N.D. Cal. 2017) (quoting *Unelko Corp. v. Rooney*, 912 F.2d 1049, 1058 (9th Cir. 1990)).

20

1    Moreover, other than its claim that the statement at issue is defamatory, which is not

2  sufficient to warrant a preliminary injunction under the authorities cited above, Maffick does not

3  identify a "clear and present danger" or a "serious and imminent threat to a protected competing

4  interest" that would warrant a prior restraint on speech.  *Levine*, 764 F.2d at 595.  Indeed, "[s]ince

5  even potential danger to national security has been held insufficient to override prior restraint," the

6  alleged "disparaging comments" about Maffick that purportedly "threaten[]" its business "do not

7  pass muster."  *Gold Coast,* 2019 WL 4305540, at *4–5.  Nor does Maffick explain why the

8  traditional remedy for alleged defamation, namely, monetary damages after the fact, is not available,

9  given that the primary injury alleged by Maffick is its purported inability to "monetize" its Pages.

10 *See Brunette v. Humane Soc'y of Ventura Cty.*, 40 F. App'x 594, 598 (9th Cir. 2002) (affirming

11 denial of request for injunction prohibiting publication as a "prior restraint" and noting that "post-

12 publication remedies will adequately compensate" the plaintiff "for any *injury*"); *see infra* at 10-11.

13    In a belated recognition of the constitutional obstacles to its sought-after relief, Maffick

14 argues at the end of its brief that its requested TRO is somehow consistent with the First

15 Amendment.  Mem. 19-20.  But Maffick's cited cases do not support this position.  Indeed,

16 Maffick's principal authority, *Balboa Island Village Inn, Inc. v. Lemen*, 40 Cal. 4th 1141 (2007),

17 actually supports Facebook's position.  As Maffick concedes, *Balboa Island* involved the issuance

18 of a preliminary injunction "following a trial at which it [was] determined that the defendant

19 defamed the plaintiff."  *Id*. at 1155-56.  *Balboa Island* expressly distinguished a preliminary

20 injunction issued after a trial from one requested before a trial, concluding that only the former is

21 consistent with the First Amendment.  *Id*.  Likewise, in *San Antonio Community Hospital v.*

22 *Southern California District Council of Carpenters* and *Aguilar v. Avis Rent A Car System, Inc.*, the

23 courts affirmed preliminary injunctions issued *after* an evidentiary hearing and a jury finding,

24 respectively.  *See* 125 F.3d 1230, 1239 (9th Cir. 1997); 21 Cal. 4th 121, 138 (1999); *see also*

25 *Overstreet v. United Brotherhood of Carpenters & Joiners of Am., Loc. Union No. 1506*, 409 F.3d

26 1199, 1218 (9th Cir. 2005) (distinguishing *San Antonio Community Hospital* given absence of any

27 "adequate determination" of whether statements fraudulent and holding that "issuing a *preliminary*

28

-9-

injunction against speech based on its falsity would create particularly significant risks to the First Amendment" and rejecting "preliminary prior restraint" on speech).[8]

In sum, Maffick's request for a TRO requiring Facebook to remove certain speech from its Facebook Pages is an impermissible prior restraint that does not meet the exacting constitutional requirements required of such relief, and on that basis alone should be denied.

### B.      Maffick Has Not Established Imminent Irreparable Harm

Apart from its constitutional infirmities, the requested TRO should be denied because Maffick has not demonstrated irreparable harm.  "[E]conomic injury alone does not support a finding of irreparable harm, because such injury can be remedied by a damage award."  *Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991). "Unless a party seeking a preliminary injunction can demonstrate that its very business existence is threatened, injury which is wholly financial in nature will not support a preliminary injunction because it is a calculable harm that can be remedied by a damages award, and thus is not irreparable."  *Bell Atl. Bus. Sys., Inc. v. Storage Tech. Corp*., 1994 WL 125173, at *2 (N.D. Cal. Mar. 31, 1994); *see Am. Passage Media Corp. v. Cass Commc'ns, Inc*., 750 F.2d 1470, 1473 (9th Cir. 1985) ("Without a sufficient showing that [conduct] threatened AP's existence, any loss in revenue … is compensable in damages.").  Further, such "harm must not only be irreparable, it must be imminent; establishing a threat of irreparable harm in the indefinite future is not enough. Rather, 'a plaintiff must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief.'"  *Amylin Pharm., Inc. v. Eli Lilly & Co*., 456 F. App'x 676, 679 (9th Cir. 2011) (quoting *Caribbean Marine Servs. Co. v. Baldrige,* 844 F.2d 668, 674 (9th Cir. 1988)).

Maffick has not come close to making such a showing.  Maffick's CEO, Ms. Naouai, claims that "Maffick's monetization from its Facebook pages for July has dropped by 50% from its monthly average for 2020" and that Maffick is "seeing a 74% decrease in the 'reach' of its social

---

[8] The third case cited by Maffick, *Martin v. Reynolds Metals Co.*, 224 F. Supp. 978 (D. Or. 1963), concerns the issuance of a preliminary injunction after evidentiary findings made by a Special Master, and in any event predates the more recent decisions discussed above concerning preliminary injunctions as prior restraints on speech subject to strict scrutiny.

media."  Naouai Decl. ¶ 25.  As Maffick itself concedes by highlighting these precise percentage

decreases, such harms are calculable and therefore "properly characterized as economic injuries

that can be remedied by monetary damages."  *Arcsoft, Inc. v. Cyberlink Corp.,* 153 F. Supp. 3d

1057, 1074 (N.D. Cal. 2015).  Indeed, elsewhere in its brief, Maffick appears to concede that its

harms are compensable, stating that it "suffer[ed] *provable damages* as a result of Facebook's

publication" of the state-controlled media label.  Mem. 13 (emphasis added).  And nowhere does

Maffick argue, or even suggest, that it is on the brink of ceasing to exist as a result of this

purported harm.  *See Stackla, Inc. v. Facebook Inc.,* 2019 WL 4738288, at *5 (N.D. Cal. Sept. 27,

2019) (denying TRO because allegations that plaintiff would "lose existing clients and fail to

attract new clients due to Facebook's ban" failed to establish that "those harms would lead to

the *irreparable* harm it seeks to remedy—its destruction as a business." (emphasis added));

*AboveGEM, Inc. v. Organo Gold Mgmt., Ltd.*, 2019 WL 3859012, at *5 (N.D. Cal. Aug. 16, 2019)

(no irreparable harm as plaintiff offers no "indication of when it would be driven out of business").

        And at any rate, Maffick's claimed losses of monetization and content "reach" are deficient

even on their own terms.  First, "the link between the decrease" in monetization and web traffic and

Facebook's application of the SCME label "remains utterly speculative."  *Arcsoft,* 153 F. Supp. 3d

at 1074.  Maffick does not offer any evidence that this drop in "monetization" and "reach" is in any

way connected to the addition of the label to its Pages.  *See id.* (noting that "timing" evidence

"do[es] not support a reasonable inference" that economic harm resulted from alleged conduct).

Indeed, Maffick does not even address the possibility that a drop in "monetization" and "reach"

could be the result of other factors, such as the significant economic downtown caused by the global

COVID-19 pandemic.  *See, e.g., Stackla*, 2019 WL 4738288, at *3-4 (rejecting claim of loss of

"prospective clients" as irreparable harm where "Stackla merely alleges but does not demonstrate

that Facebook's ban caused this alleged harm (rather than, for example, prior negative media

attention), or that the injunctive relief it seeks would be effective in curing it."); *Danaei v. Rostam*,

2017 WL 2719984, at *3 (C.D. Cal. Feb. 2, 2017) ("while Movant submits Internet traffic analytics

showing significant decrease in visits to its websites, it is unclear how much of the decrease is

attributable to [defendant's alleged conduct] rather than" other conduct).

Moreover, Maffick's claims of lost traffic are highly questionable—Facebook began labeling Maffick's Pages at the beginning of June, but Maffick's own evidence indicates that one of its sites remained "in the top ten of all U.S. Facebook pages for news and politics, based on total number of views" for the month of June. Mem. 2.  Nor does Maffick explain how a loss of traffic to its Pages constitutes irreparable harm, and it does not.  *See Bell Atl. Bus. Sys.*, 1994 WL 125173, at *2 ("Although a loss of customers and a resulting loss in revenue surely make it more difficult to compete, they do not amount to irreparable harm because such injuries are measurable and thus have an adequate remedy at law."); *Ebates Performance Mktg., Inc. v. Integral Techs., Inc.*, 2013 WL 75929, at *2 (N.D. Cal. Jan. 4, 2013) (finding no irreparable harm that would warrant preliminary injunction and noting that "claims of loss of customers and market share…are measurable and are best characterized as economic harms").

Maffick's attempts to frame its alleged injury in terms of damage to goodwill and reputation do not help its cause.  While damage to goodwill can constitute irreparable harm, *Herb Reed Enters., LLC v. Florida Entmt. Mgmt., Inc.* 736 F.3d 1239, 1250 (9th Cir. 2013), the "mere possibility" of such harm "is not enough to justify a preliminary injunction," *Arcsoft*, 153 F. Supp. 3d at 1071.  Similarly, "[s]peculative injury cannot be the basis for a finding of irreparable harm." *In re Excel Innovations, Inc.*, 502 F.3d 1086, 1098 (9th Cir. 2007).  Maffick's assertion of lost good will and reputation does not meet this standard.  Ms. Naouai states in her declaration that the label "has had a devastating effect on Maffick's reputation and business opportunities and relationships." Naouai Decl. ¶ 25.  This is precisely the sort of "conclusory assertion[]" that courts have repeatedly found insufficient to warrant an injunction.  *Arcsoft*, 153 F. Supp. 3d at 1071; *see Purdum v. Wolfe*, 2014 WL 171546, at *9 (N.D. Cal. Jan. 15, 2014) ("While '[e]vidence of loss of control over business reputation and damage to goodwill *could* constitute irreparable harm,' a plaintiff must establish such likelihood *with evidence*" (emphasis in original)).  For example, the declaration does not identify any particular business opportunities or relationships that were allegedly harmed.  *See Stackla*, 2019 WL 4738288, at *4 (no irreparable harm finding where plaintiff "does not identify a

single client that it will imminently lose (or even an exemplary client it has already lost)").

In an effort to remedy these obvious shortcomings in its irreparable injury showing, Maffick attaches a collection of comments from visitors to Maffick's Facebook Pages.  Courts have "not [been] convinced that anecdotal comments on the internet establish a likelihood of irreparable harm sufficient to justify extraordinary relief in the form of a preliminary injunction."  *Lilith Games (Shanghai) Co. v. UCool, Inc*., 2015 WL 5591612, at *11–12 (N.D. Cal. Sept. 23, 2015).  Such arguments are no more successful here, for several reasons.

First, Maffick does not offer any evidence connecting the comments to the harm that Maffick alleges its business has suffered.  Maffick does not contend, for example, that the individuals who posted these messages were considering entering into any kind of business relationship with Maffick, or were even Maffick's regular visitors (as opposed, to, e.g., Internet "trolls").  *See Li v. Home Depot USA Inc.*, 2013 WL 12120065, at *2 (C.D. Cal. Jan. 7, 2013) (denying preliminary injunction based on information published on website and noting that "a few potentially cherry-picked reviews are insufficient to establish that [plaintiff] is likely to suffer irreparable harm to its reputation.").  And even if these were Maffick's regular visitors, Maffick does not provide any evidence to support the assertion that these individuals stopped visiting Maffick's Pages after posting these comments, or that any such decision by these particular individuals would have otherwise harmed Maffick's business.  *See Stackla*, 2019 WL 4738288, at *4 ("the fact that customers have 'raised ... concerns'" does "not demonstrate a likelihood that they will cease" using defendant's services, "much less that they will do so imminently.").

Second, several of the comments reference *news stories* about Maffick, not Facebook's label, and so any harm to Maffick revealed by these comments would not have been the result of Facebook's label.  *See* Naouai Decl., Ex. 4 at 2, 14, 44, 46.  Likewise, there are several similar comments made on Maffick's Pages discussing its connections to Russia *before* Facebook's placement of the label, further showing the highly attenuated link between the label and any reputational harm.  Blavin Decl., Ex. P.  For example, in response to a May 28, 2020 post by In The Now titled, "GEORGE FLOYD'S MESSAGE FOR YOUNG PEOPLE," a user wrote, "Look

at who owns this website and media agency. Deeply Russian ties." *Id.* at 3.  Third, the comments also reveal statements that are supportive of Maffick, dismissive of the label, or appear to accept at face value Maffick's explanation of its lack of affiliation with Russia.  *See* Naouai Decl., Ex. 4 at 34, 48, 57, 59.  Thus, Maffick does not even attempt to explain how these comments constitute evidence of any kind of harm at all, let alone irreparable harm.

### C.      Maffick Is Unlikely To Prevail on the Merits

The TRO should also be denied because Maffick is unlikely to prevail on the merits of its claims.  First, all of Maffick's claims fail because the statement at issue is a classic example of a constitutionally protected opinion that cannot be defamatory or otherwise unlawful under the First Amendment.  Second, as a public figure for purposes of this suit, Maffick is required to show actual malice under *New York Times v. Sullivan*, and Maffick has not shown that it is likely to meet this heightened standard.  Third, Maffick fails to establish the basic elements of its remaining claims.

### 1.      The Statement At Issue Is Constitutionally-Protected Opinion

Under both federal and California law, a statement of opinion is protected under the First Amendment unless it implies a false assertion of fact.  *Obsidian Fin. Grp. v. Cox*, 740 F.3d 1284, 1293 (9th Cir. 2014); *Weiner v. San Diego Cty.*, 210 F.3d 1025, 1031 (9th Cir. 2000) ("Opinions, that is, 'statements that cannot reasonably be interpreted as stating actual facts,' are protected by the First Amendment and, as a result, cannot be the basis of a state-law defamation claim.").

Courts have recognized that an organization's application of multiple criteria to render a collective judgment constitutes an opinion that cannot be the basis for a defamation claim.  Thus, in *Botos v. Los Angeles County Bar Association*, 151 Cal. App. 3d 1083, 1090 (1984), the court affirmed the dismissal of a defamation action against a bar association by a judicial candidate who was rated by the association as "not qualified."  The court explained that the rating reflected the association's "collective *opinion* of [the plaintiff], based on a majority or greater vote."  *Id.* at 1089.  The court concluded that, "[a]s a collective judgment of his qualifications, it may have ranged from being well founded to utterly wrong," but the association "has a right to express its view on who is or is not qualified for judicial office."  *Id.*  Cases from this District and other

jurisdictions similarly support the proposition that application of multiple criteria to determine whether a particular label applies is a matter of opinion that is not actionable. *See, e.g., ZL Techs., Inc. v. Gartner, Inc.,* 709 F. Supp. 2d 789, 800–01 (N.D. Cal. 2010), *aff'd sub nom.,* 433 F. App'x 547 (9th Cir. 2011) (company's rating of plaintiff as "Niche Player" takes into account numerous factors and reflects its "opinion" protected under the First Amendment)*; Forsyth v. Motion Picture Ass'n of Am., Inc.*, 2016 WL 6650059, at *3–4 (N.D. Cal. Nov. 10, 2016) (defendant "holds First Amendment rights to express its opinions that are reflected in the [parental caution] ratings system" which "precludes the basic relief [plaintiff] seeks in this action—forcing [defendant] to express different or additional opinions"); *Aviation Charter, Inc. v. Aviation Rsch. Grp./US*, 416 F.3d 864, 870 (8th Cir. 2005) (although defendant's statement "relies in part on objectively verifiable data, the interpretation of those data was ultimately a subjective assessment, not an objectively verifiable fact."); *Davis v. Avvo, Inc.*, 345 F. Supp. 3d 534, 541 (S.D.N.Y. 2018) ("What factors the defendant believes to be important in assessing attorneys, and the result of the defendant's weighing of those factors, cannot be proven false. The [defendant's] ratings are therefore protected under the First Amendment … as statements of opinion.").[9]

Here, as in these cases, the statement at issue reflects the collective judgment of an organization about the application of the organization's own stated criteria.  Facebook's use of its SCME label extends beyond merely determining sources of funding or ownership.  Rather, Facebook's decision to apply its SCME label to a particular Page reflects Facebook's subjective assessment of editorial control exerted over that Page by a government.  This assessment is based on Facebook's weighing of multiple criteria, including the organization's mission statement,

---

[9] *See also*, e.g., *Browne v. Avvo Inc.*, 525 F. Supp. 2d 1249, 1252 (W.D. Wash. 2007) ("Avvo's website contains numerous reminders that the Avvo rating system is subjective. The ratings are described as an 'assessment' or 'judgment,' two words that imply some sort of evaluative process."); *Compuware Corp. v. Moody's Invs. Servs., Inc.*, 499 F.3d 520, 529 (6th Cir. 2007) ("A Moody's credit rating is a predictive opinion, dependent on a subjective and discretionary weighing of complex factors" and thus cannot be subject of a defamation action); *Castle Rock Remodeling, LLC v. Better Bus. Bureau of Greater St. Louis, Inc.*, 354 S.W.3d 234, 242–43 (Mo. Ct. App. 2011) (BBB ratings system protected as opinion under First Amendment as it "relies on objective and subjective components, and BBB's weighting of the objective data. … [It] is clear that the impression of the rating is opinion" and is "based on 'an evaluating process' and 'subjective opinion.'").

ownership structures, editorial guidelines, composition of newsroom leadership and staff, sources of revenue, governance and accountability mechanisms, open source data, and various country-specific factors. *Supra* at 4.  Thus, the designation "state-controlled media" is not based on any one fact, such as ownership or sources of funding, but rather involves the exercise of Facebook's judgment as to how multiple factors apply in the specific case.  And all this is evident to the public, as Facebook's SCME criteria and process are posted on its website.  *See id.*  As such, Facebook's determination and designation of a particular page as "state-controlled media" does not and cannot imply the assertion of an objective fact, as required under the First Amendment and California law.

Maffick's observation that the label reflects an assessment by Facebook based on underlying facts does not alter this analysis.  On the contrary, courts in this District have concluded that a designation based on the speaker's weighing of multiple criteria, including facts, does not constitute an actionable statement of fact.  In *ZL*, the plaintiff contended that the defendant's rating of its company as a "Niche Player" in published reports could form the basis for a defamation suit because the defendant considered underlying facts in making the rating.  709 F. Supp. 2d at 789 (N.D. Cal. 2010).  The court rejected that argument, observing that "[m]ost opinions are based at least in part on facts" and therefore "[t]hat [the defendant] considered facts in forming its opinions does not mean that the opinions are objectively verifiable." *Id.* at 798.  On the contrary, the court noted that the "weight" the defendant "applies to these facts is not verifiable, as it is reflective of [the defendant's] subjective assessment of what is important in" making its rating determinations.  *Id.*  Further, the court concluded that because the statements at issue "do not imply the assertion of specific *objective* facts, they are not actionable—even though they undeniably rest upon a large body of specific yet undisclosed facts." *Id.* at 800.

Here, as in *ZL*, the statement at issue reflects a subjective assessment based on the weighing of various factors.  That Facebook considered facts in making this subjective assessment does not transform the label "state-controlled media" into an express or implied statement of fact.

Maffick's bald assertion that it is not "state-controlled media" fares no better than Botos's defamation claim based on his assertion that he was not "unqualified" to be a judge or ZL's

defamation claim based on its assertion that it was not a "Niche Player"—these claims merely rest on a disagreement about a conclusion arising out of the application of a set of multiple criteria to particular circumstances, and are not actionable under the First Amendment.

### 2.       Maffick Cannot Establish Actual Malice

Maffick is unlikely to prevail on the merits of its claims for the additional reason that it cannot demonstrate—and indeed does not even allege—actual malice.

Under *New York Times v. Sullivan*, a public figure cannot prevail in a defamation suit unless the figure can show that the allegedly defamatory statements were made with actual malice, that is, with knowledge of their falsity or with reckless disregard for the truth.  The Supreme Court has explained that the actual malice standard is warranted for public figures because they enjoy "greater access to the channels of effective communication" and therefore are better able to "contradict the lie or correct the error."  *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 344 (1974).  In addition, the actual malice standard reflects the fact that public figures have achieved their position "by reason of the notoriety of their achievements or the vigor and success with which they seek the public's attention," and therefore voluntarily expose themselves to public criticism.  *Id.* at 342.

The Supreme Court has explained that the category of public figures includes limited purpose public figures, who achieve that status by "thrust[ing] themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved."  *Gertz*, 418 U.S. at 345.  In deciding if an organization is such a public figure, the court considers "whether (i) a public controversy existed when the statements were made, (ii) whether the alleged defamation is related to the plaintiff's participation in the controversy, and (iii) whether the plaintiff voluntarily injected itself into the controversy for the purpose of influencing the controversy's ultimate resolution."  *Makaeff v. Trump Univ., LLC*, 715 F.3d 254, 266 (9th Cir. 2013).

For purposes of this case, Maffick is certainly at least a limited purpose public figure.  As Maffick alleges in its complaint, Maffick uses Facebook to participate in the public discussion about current affairs.  Compl. ¶¶ 11-13.  Indeed, Maffick's very purpose in using Facebook is to increase its profile and visibility to the public on matters of international importance, including

matters concerning foreign influence in United States politics.  *See supra* at 2-4.  The statement at issue here is directly related to Maffick's voluntary participation in that public conversation.

Because it is a public figure, to prevail on its defamation claim Maffick must show that Facebook acted with knowledge of the statement's falsity or reckless disregard for its truth. Maffick cannot meet this "high standard."  *Dodds v. Am. Broad. Co.*, 145 F.3d 1053, 1061 (9th Cir. 1998).  As the Supreme Court explained in *Harte-Hanks Communications, Inc. v. Connaughton*, reckless disregard for the truth "requires more than a departure from reasonably prudent conduct."  491 U.S. 657, 688 (1989).  Rather, "[t]here must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts about the truth of his publication."  *Id.*  This standard is subjective, which means that the defendant must have "actually had a high degree of awareness of … probable falsity."  *Id.*  Even a "failure to investigate before publishing, even when a reasonably prudent person would have done so" is insufficient.  *Id.*

Maffick does not allege nor put forward any facts from which any reasonable trier of fact could infer actual malice, let alone facts that would establish a likelihood of success under this high standard.  On the contrary, as discussed above, Facebook had ample evidence supporting its assessment that Maffick was "state-controlled media" under its announced criteria.  And as part of the internal appeal process, Facebook even encouraged Maffick to provide additional materials to demonstrate its editorial independence.  *See* Gleicher Decl. ¶¶ 10, 16.

Maffick does not appear to dispute that it is at least a limited purpose public figure.  Mem. 13 n.1.  Instead, Maffick argues that (1) the actual malice standard applies only to recovery of damages and not to a preliminary injunction, and (2) it can meet the actual malice standard.  These arguments are without merit.

First, Maffick's contention that the actual malice standard applies only to suits for damages finds absolutely no support in the law.  Maffick does not cite a single case in support of this proposition, and in fact a case relied upon by Maffick elsewhere in its brief says the opposite.  *See San Antonio Cmty. Hosp.*, 125 F.3d at 1235 (noting that, in considering motion for preliminary injunction on defamation claim, "[w]e thus must decide whether the Hospital satisfactorily

demonstrated a reasonable chance of meeting this standard at trial, commonly known as the *New York Times* 'actual malice' standard."); *see also Kournikova v. Gen. Media Commc'ns, Inc.*, 2002 WL 31628027, at \*10 (C.D. Cal. Aug. 9, 2002) (denying motion for preliminary injunction to restrict publication under Lanham Act on the grounds that "Plaintiff's evidence falls far short of establishing, by clear and convincing evidence, that Defendant acted with actual malice").

Second, Maffick's only allegation in support of actual malice is that because it told Facebook that it is not controlled by the Russian government, Facebook's disregard of Maffick's own conclusory, unsubstantiated statements demonstrates Facebook's malice. *Supra* at 5. The law does not require Facebook to take Maffick's claims that it does not satisfy the state-controlled media criteria at face value. If it did, then the actual malice standard would be meaningless—any plaintiff could establish actual malice simply by denying the truth of the statement at issue to the defendant and then relying on its own denial to prove reckless disregard.

On the contrary, courts consistently have rejected the assertion that the plaintiff's own denial of the truth of the statement is sufficient to establish actual malice on the part of the defendant. *See Harris v. City of Seattle*, 152 F. App'x 565, 569 (9th Cir. 2005) ("[A] reporter need not believe self-serving denials, 'as such denials are so commonplace in the world of polemical charge and countercharge.'" (alteration in original)); *Worrell-Payne v. Gannett Co.*, 49 F. App'x 105, 108 (9th Cir. 2002) (defendant's own self-serving statements "did not prove the falsity of the essential facts upon which the stories were based, the statements themselves, or the impressions being reported," and therefore did not support assertion of actual malice).

### 3.   Maffick Has Not Established The Elements Of Its Claims

#### (a)   Maffick Cannot Establish That The Statement Is Defamatory

Even if Maffick could establish that Facebook's decision to apply the label "state-controlled media" to its Pages was a statement of fact (which it cannot), and that Facebook acted with actual malice (which it also cannot), Maffick still would not be likely to prevail on its claim because the label is devoid of defamatory meaning. Under California law, "[d]efamatory statements must not only be false and unprivileged to constitute slander, but they must have a 'natural tendency to injure' or cause special damage." *Lieberman v. Fieger*, 338 F.3d 1076, 1081

(9th Cir. 2003).  In other words, the statement must have a tendency to expose the plaintiff to "hatred, contempt, ridicule, or obloquy."  *Copp v. Paxton*, 45 Cal. App. 4th 829, 839 (1996).

The statement at issue has no such defamatory meaning.  On the contrary, as the criteria applied by Facebook make clear, the label "state-controlled media" reflects Facebook's subjective assessment of the relationship between the entity at issue and foreign governments, based on a variety of factors.  There is nothing inherently good or bad about the nature of those relationships, and Facebook does not apply the label in order to degrade or ridicule a particular entity, but rather to provide its users with its own assessment about the sources of news disseminated on its platform.

### (b)   *Maffick's Lanham Act Claim Fails*

In addition to the First Amendment barring Maffick's Lanham Act challenge on the grounds that the label is neither a statement of fact nor false, Maffick cannot prevail on its Lanham Act claim because it cannot establish that Facebook's "state-controlled media" label is commercial speech.  The Lanham Act applies only to commercial speech, because, as "a matter of First Amendment law, commercial speech may be regulated in ways that would be impermissible if the same regulation were applied to noncommercial expressions."  *Bosley Med. Inst., Inc. v. Kremer*, 403 F.3d 672, 677 (9th Cir. 2005); *see also Nichols v. Club for Growth Action*, 235 F. Supp. 3d 289, 297 (D.D.C. 2017) (the "Act restricts only commercial speech, as commercial speech is entitled to reduced protection under the First Amendment.").  The Lanham Act's requirement that the challenged conduct occur "in connection with any goods or services" thus has been understood to impose a "commercial use requirement."  15 U.S.C. § 1125(a)(1); *Bosley*, 403 F.3d at 677; *Utah Lighthouse Ministry v. Found. for Apologetic Info. and Rsch.*, 527 F.3d 1045, 1051-52 (10th Cir. 2008).  Similarly, the false advertising prong requires that the challenged statement be made "in commercial advertising or promotion."  15 U.S.C. § 1125(a)(1)(B).

Facebook's state-controlled media label is not commercial speech.  "The core notion of commercial speech is speech which does no more than propose a commercial transaction."  *Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1181 (9th Cir. 2003) (*abrogated on other grounds by Skidmore as Tr. for Randy Craig Wolfe Tr. v. Zeppelin*, 952 F.3d 1051, 1057 (9th Cir. 2020)).  Yet Facebook's SCME label proposes no transaction—and is in fact not intended to sell any goods or services.  The

-20-

1   label does not earn or generate any revenue.  It is not itself advertising, it does not include any

2   advertising, and it does not even direct a viewer to any location with advertising.  *See Utah*

3   *Lighthouse Ministry*, 527 F.3d at 1052; *Bosley*, 403 F.3d at 678.  Indeed, Facebook could not be

4   using the label as part of proposing a "commercial transaction," because Facebook "is available for

5   free to the general public" and there is thus "no 'purchase.'" *New.Net, Inc. v. Lavasoft*, 356 F. Supp.

6   2d 1090, 1118 (C.D. Cal. 2004).  Instead, the label is "communicating ideas" and "expressing points

7   of view"—speech which cannot be regulated under the Lanham Act.  *Bosley*, 403 F.3d at 677.

8          Maffick tries to argue otherwise, but its own statements regarding Facebook's intent behind

9   the label make clear that its arguments fail.  According to Maffick, Facebook uses the label to

10  "promote the image of Facebook as a responsible social media platform" and show that it is "taking

11  sufficient actions to preserve the integrity of U.S. elections from improper social media influence

12  by foreign governments"—not to sell anything.  Mot. 16; Compl. ¶ 82.  The fact remains that

13  Facebook's label communicates ideas "on an issue of public importance," and so "it cannot be said

14  that the sole purpose of the speech is to propose a commercial transaction." *New.Net*, 356 F. Supp.

15  2d at 1117; *see also id.* (noting that the Lanham Act "has never been applied to stifle criticism of

16  the goods or services of another by one, such as a consumer advocate, who is not engaged in

17  marketing or promoting a competitive product or service.").  Thus, because the label is used "not in

18  connection with a sale of goods or services—but in connection with the expression of [Facebook's]

19  opinion," and on a topic of great public importance—Facebook's use of the label is not actionable

20  under the Lanham Act.  *Utah Lighthouse Ministry*, 527 F.3d at 1053.[10]

                         *(c)      Maffick's UCL Claim Fails*

22         Maffick concedes that the success of its UCL claim is tied to the success of its Lanham Act

23  claim.  *See* Mem. 17.  Thus, for the same reasons that its Lanham Act claim fails, so too does its

24  UCL claim.  While Maffick further asserts that the UCL covers a "broader range of false and

25  harmful statements" than the Lanham Act, Mem. 17, it offers no support for that statement.  Nor

26  can it, as the Ninth Circuit "has consistently held that state common law claims of unfair

---

[10] Plaintiff's Lanham Act claim is its sole alleged basis for federal jurisdiction in this case.

competition and actions pursuant to California Business and Professions Code § 17200 are 'substantially congruent' to claims made under the Lanham Act," *Cleary v. News Corp.*, 30 F.3d 1255, 1262-63 (9th Cir. 1994), and that the claims are "inextricably linked," *Millennium Laboratories, Inc. v. Ameritox. Ltd.*, 817 F.3d 1123, 1131 (9th Cir. 2016).[11]  Maffick therefore cannot establish a likelihood of success on its UCL claim.

### (d)   Maffick's Tortious Interference Claim Fails

To prevail on a claim of tortious interference, Maffick must establish (1) "the existence of a prospective business relationship containing the probability of future economic rewards for plaintiff"; (2) Facebook's knowledge about that relationship; (3) that Facebook took "intentional acts" that were "designed to disrupt [that] relationship"; (4) "actual causation;" (5) that Facebook "proximately caused" Maffick's damages; and (6) that Facebook "engaged in an independently wrongful act." *Prostar Wireless Grp., LLC v. Domino's Pizza, Inc.*, 360 F. Supp. 3d 994, 1015 (N.D. Cal. 2018).  Maffick cannot establish these elements.

As to the first element, Maffick's alleged "relationships with millions of users on Facebook," Mem. 18, is not the required "business relationship with a specific third party containing the probability of future economic benefit." *Prostar Wireless*, 360 F. Supp. 3d at 1016.  As an initial matter, Maffick has failed to establish a "relationship with a *particular individual*." *Damabeh v. 7-Eleven, Inc.*, 2013 WL 1915867, at *10 (N.D. Cal. May 8, 2013) (emphasis added).  In *AdTrader, Inc. v. Google LLC*, 2018 WL 3428525 (N.D. Cal. July 13, 2018), the court dismissed plaintiff's claim where the plaintiff "merely lump[ed] allegations regarding more than two hundred web publishers without pleading factual allegations as to the *specific relationship* between [plaintiff] and each publisher." *Id.* at *6 (emphasis added).  Maffick's claim is even less specific, as there is no attempt to identify any individual Facebook user beyond a group of "millions."  Maffick's "reference to 'Facebook users' is too ambiguous and speculative to establish the existence of an economic relationship." *Dolin v. Facebook, Inc.*, 2018 WL 2047766, at *3 (N.D. Cal. May 2, 2018).

Even if Maffick had identified specific Facebook users, Maffick cannot establish that it has

---

[11] In fact, because the Lanham Act's commercial use limitation is constitutionally mandated, *see supra* Section IV.C.3.b, it applies equally to Maffick's UCL claim.

or expects to have an economic or business relationship *with those users*.  Maffick does not claim

that it earned or expected to earn any money from Facebook users.  Instead, any money Maffick

earned came from *Facebook*, not its users, pursuant to Facebook's standard publisher agreement

with Maffick, and derived from Facebook's relationship with its *advertisers*.  Gleicher Decl. ¶ 17.

That alone dooms Maffick's interference claim.  *E.g.*, *Mishiyev v. Alphabet, Inc.*, 2020 WL 1233843

at *5 (N.D. Cal. Mar. 13, 2020) (dismissing interference claims where "money plaintiff earned

'from' his subscribers came from YouTube pursuant to YouTube's agreement with plaintiff.").[12]

Maffick fares no better on the other elements.  Even assuming that Maffick's relationship

with Facebook users was sufficient, Maffick presents no evidence that Facebook intended to disrupt

this relationship.  Indeed, as noted, Maffick itself states in its brief that Facebook has developed and

applied the SCME label to be a "responsible social media platform" and show that it is "taking

sufficient actions to preserve the integrity of U.S. elections from improper social media influence by

foreign governments," not for the purpose of interfering with any commercial relationships of Maffick.

Mem. 16; Gleicher Decl. ¶ 3.  Likewise, as noted above, though Maffick claims its monetization and

viewership dropped, it has offered no evidence that the state-controlled label was the *cause* of this

decrease.  *Supra* at 11-12; *see RingCentral, Inc. v. Nextiva, Inc.*, 2020 WL 4039322, at *5 (N.D.

Cal. July 17, 2020) (claims plaintiff lost prospective customers "insufficient" as court could not

conclude "prospective customers would have dealt with [defendant] absent [alleged] interference.").

Finally, Maffick's tortious interference claim must fail because its defamation, Lanham

Act, and UCL claims fail.  Without any other allegation that Facebook engaged in a wrongful act

that is "proscribed by some constitutional, statutory, regulatory, common law, or other

determinable legal standard," *Prostar*, 360 F. Supp. 3d at 1016, Maffick's claim cannot succeed.

---

[12] Maffick also notes that it has "substantially monetized its social media pages through advertising and agreements and strategic partnerships with various e-commerce vendors and is expanding its paid partnerships."  Mem. 18.  To the extent Maffick intends to suggest it has additional relationships that could serve as the basis of its tortious interference claim, Maffick fails to identify any *specific* relationship, does not allege that Facebook interfered with, knew about, or intended to disrupt these relationships, or that any alleged disruption caused any harm or damages.

**D.     The Balance of Equities Weigh Against a TRO**

The balance of equities also tip against granting the requested TRO.  "A plaintiff seeking a preliminary injunction must establish that the balance of equities tips in his favor."  *Maxim Integrated Prods., Inc. v. Quintana*, 654 F. Supp. 2d 1024, 1036 (N.D. Cal. 2009).  To balance the equities, the Court "will look to the possible harm that could befall the various parties."  *Id.*

The harm to Facebook from granting the requested TRO is severe.  As discussed above, the TRO constitutes a prior restraint on Facebook's speech on a matter of significant public concern.  The infringement on Facebook's constitutional rights that would result from issuing the TRO is a significant factor in balancing the equities.  *See IBiz, LLC v. City of Hayward*, 962 F. Supp. 2d 1159, 1170 (N.D. Cal. 2013) (noting "loss of…constitutional rights" as factor in balancing equities).

In addition, the requested TRO harms Facebook by destroying the company's ability to implement a policy that was created to provide more transparency to its users.  As discussed, Facebook carefully crafted its policy regarding labeling of state-controlled media outlets after consulting with numerous experts.  *Supra* at 4. That policy identified multiple criteria that Facebook would use in making its subjective assessments about when to apply the label, and created an appeals process for any entity that disagreed with Facebook's judgment.  Facebook has a strong interest in its ability to implement policies like this one that are aimed at protecting its users.  *Supra* at 4-5.  A TRO requiring Facebook to remove the label from a particular Page would destroy this policy by allowing any labeled entity to immediately apply for injunctive relief.

By contrast, the harms to Maffick are slight.  As discussed above, the primary harm alleged by Maffick—a decrease in its ability to "monetize" its presence on Facebook and "reach" its audience—can be remedied through monetary damages.

**E.     A TRO Does Not Serve The Public Interest**

Finally, the request for a TRO should be denied because it does not serve the public interest.

As courts in this District have recognized, "Facebook's ability to decisively police the integrity of its platforms is without question a pressing public interest."  *Stackla*, 2019 WL 4738288, at *6.  In *Stackla*, the court declined to enter a TRO in a dispute over Facebook's application of its

-24-

policies protecting user data.  In concluding that a TRO in that case would not serve the public interest, the Court reasoned that "the public has a strong interest in the integrity of Facebook's platforms, Facebook's policing of those platforms for abuses, and Facebook's protection of its users' privacy."  *Id.*  Accordingly, the Court held that "the public's interest favors allowing" Facebook to continue applying its policies "pending at least a motion for a preliminary injunction."  *Id.*

Here, as in *Stackla*, the public has a strong interest in Facebook maintaining its transparency policies.  Facebook implemented those policies to allow its users to make informed judgments about the sources of information available on the platform.  *See supra* at 4-5.  The entry of a TRO in this matter would effectively destroy Facebook's ability to fulfill that goal, as any entity subject to a notice could simply file a lawsuit to have the notice immediately removed.

Moreover, a preliminary injunction or TRO that amounts to a prior restraint runs contrary to the public interest in upholding the First Amendment.  "Courts considering requests for preliminary injunctions have consistently recognized the significant public interest in upholding First Amendment principles."  *Sammartano v. First Jud. Dist. Ct., in and for Cty. of Carson City*, 303 F.3d 959, 974 (9th Cir. 2002) (*abrogated on other grounds by Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)).  As set forth above, the requested TRO is a prior restraint on speech, and thus the public interest in upholding First Amendment principles weighs strongly against it.

Maffick's argument that the public interest favors a TRO impermissibly collapses the public interest and likelihood of success prongs of the legal standard.  Maffick asserts that the public has an interest in truthful information about social media sources and in the enforcement of unfair competition laws.  Mem. 21.  But those arguments beg the question by assuming the merits of Maffick's claims.  As the court noted in *Stackla*, "[i]f an argument that a plaintiff is likely [to] prevail on the merits were enough to satisfy the public's interest in an injunction, the public's interest would be a superfluous element in the analysis."  2019 WL 4738288, at *6.

## V.     CONCLUSION

Maffick's requested TRO should be denied.

1    DATED:  August 4, 2020                    MUNGER, TOLLES & OLSON LLP

2

3

4                                             By:   */s/ Jonathan H. Blavin*
                                                   JONATHAN H. BLAVIN
5                                             Attorneys for Facebook, Inc.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                        -26-